S. HUBBELL REYNOLDS and others, appellants, *vs.* ADALINE ROOT and others, respondents.

The proponent of the will of an aged man, for probate, is not required to prove that the testator's mental faculties were those of a man in middle life, and of unimpaired physical powers. It is enough that he had sufficient mental capacity to fully comprehend the claims of his several children on his bounty, and to understand how to adjust and satisfy those claims.

To do this, the testator must know who have claims upon him, and the measure of those claims. To do this, he must understand fully what he has done, if any thing, for each or either, and the peculiar claims of any upon his justice or generosity.

It is a mistake to suppose that a testator is bound to make a will that others, acquainted with him and his situation, may deem just. No greater injustice could be done, in many instances, by a testator, than to so dispose of his property as to be what the world would call just. *Per* MULLIN, J.

Failure of memory being a natural attendant upon age, will not incapacitate an aged person from making a will.

Although the proposition that while a man's intellect may not be so weak as to render him incapable of making a will, yet it may be in that feeble state that he readily and easily becomes the victim of the improper influences of such unprincipled and designing persons as see fit to practice on him, is doubtless correct, yet mere weakness of intellect does not prove undue influence. There must be some evidence of the influence, and of its improper exercise, to justify the rejection of a will on that ground.

Direct evidence of undue influence is not necessary. It may be, and most frequently is, a legitimate inference from other facts and circumstances in the case.

The unnatural exclusion, by a testator, of his only daughter, with whom he seems to have had no difficulty, to whom he had never given more than a very trifling pittance, and who was in need of aid from him, from a just and equal share of his estate, is a strong circumstance to show either mental incapacity, or undue influence.

Where the circumstances under which a will was executed, and the condition of the testator, mental and physical, and his situation in the family of the principal legatee, at the time, were such as to excite suspicion of undue influence; *Held* that before a will executed under these circumstances, which gave, substantially, all the property to one of several children, was admitted to probate, it was due to those cut off that the case should be thoroughly examined; and that a case was therefore presented which should be submitted to a jury, upon issues framed for that purpose.

APPEAL from a decree of the surrogate of Herkimer county, refusing to admit to probate the will of Reuben Reynolds, deceased, who died in June, 1860, at the

age of 90. The will bore date Dec. 29, 1848. His wife died in March, 1845, leaving six sons and one daughter, all of whom were living at the date of the will. Isaac, one of the sons, was married in 1838, and from that time lived with his family, in his father's house; and occupied the farm, and managed and controlled all his father's property. By the will, the greater part of the testator's property was devised to his son Isaac. A legacy of $200 was given to his daughter, Adaline; that being the only provision made for her in the will.

The will was presented to the surrogate August 23, 1860. A special guardian was appointed for the minors, and citations issued, returnable October 1; and on that day Adaline Root, John Reynolds, and Alanson Reynolds appeared as contestants, and objected to the proof of the will, on the grounds that the testator was, from imbecility of mind, incompetent to make a will, and that the will was procured by improper influence.

After hearing testimony, the surrogate made a decree refusing to admit the will to probate, on the grounds above mentioned.

*S. & R. Earl*, for the appellants.

*R. Conkling*, for the respondents.

*By the Court*, MULLIN, J. I am of the opinion that the decree of the surrogate ought to be reversed, and the case given to a jury.

The evidence, on the part of the proponent, shows a substantial conformity to the provisions of the Revised Statutes, as to the manner of executing and attesting the execution of the will. It is true, that one of the subscribing witnesses does not recollect that the testator requested either of the witnesses to become a witness, but, on the contrary, thinks what was said on the subject was said by

one of the other persons in the room. This witness also thinks the testator was not of sound mind. The other witness, the scrivener who drew the will, and one of the sons, testify to facts showing a compliance with the statute.

On the question of capacity, it seems to me the surrogate has failed to give full weight to the evidence on the part of the proponent. It is overwhelming on this question; and in saying this, I lay out of the account the evidence of the members of the testator's family. The proponent was not required to prove that the testator was a man whose mental faculties were those of a man of middle life, and of unimpaired physical powers. It was enough that he had sufficient mental capacity to fully comprehend the claims of his several children on his bounty, and to understand how to adjust and satisfy those claims. To do this, the testator must know who have claims upon him, and the measure of those claims. To do this, he must understand fully what he has done, if any thing, for each or either of the peculiar claims of any upon his justice or generosity.

It is a mistake to suppose that a testator is bound to make a will that others, acquainted with him and his situation, may deem just. No greater injustice could be done, in many instances, by a testator, than to so dispose of his property as to be what the world would call just. There are so many circumstances occurring, in every family, that never reach the public eye or ear, in which the conduct of children or relations is disclosed, affecting, in the most serious manner, the happiness of its members, that the parent alone is competent to determine how much each member of his family is fairly and justly entitled to, in the division of his estate.

There is not, in all the evidence of this case, a single act proven which shows a want of capacity to make a will. Failure of memory is the first evidence of a decaying in-

Reynolds *v.* Root.

tellect; it is a natural attendant upon age, and if a defective memory would incapacitate a man from making a will, all old men would be at once deprived of the right to dispose of their estates. What is the extent of the loss of memory shown at or about the time the will was made? It is said he would repeatedly ask the same question, or relate the same incident. This is a fault not unfrequently found with those in the full possession of their faculties; and it is as often the result of inattention as it is of loss of memory.

It is also said he forgot his neighbors and friends, and after his hurt would cry easily on being informed who they were. This is a circumstance evincing a feeble intellect; but it is also evidence of great nervous excitement. Standing alone, it would be pretty strong evidence of mental debility; but there is in the case proof from sources beyond suspicion, that up to and after the time when the will was made, the testator not only understood the few matters of business he did transact, but remembered them. It is not shown that he ever forgot, so as not to recall, either his neighbors or the members of his family. Defective vision had a share in producing the inability readily to recognize those who called on him.

I entertain no doubt but that, on the evidence, the testator is shown to have had capacity to make a will.

The probate of the will was resisted on the further ground, that it was made under undue influence. In support of this view it is argued that while a man's intellect may not be so weak as to render him incapable of making a will, yet it may be in that feeble state that he readily and easily becomes the victim of the improper influences of such unprincipled and designing persons as see fit to practice on him. The proposition is doubtless correct; but mere weakness of intellect does not prove undue influence. There must be some evidence of the influence,

Reynolds *v.* Root.

and of its improper exercise, to justify the rejection of a will on that ground.

It is conceded that direct evidence of undue influence is not necessary; it may be, and most frequently is, a legitimate inference from other facts and circumstances in the case. In this case, it is sought to infer it. 1st. From the provisions of the will. 2d. From what occurred at the making of it; and 3d. From the mental and bodily condition of the testator, and his situation in the family of his son, whose family were the greatest beneficiaries under the will.

As to the first ground, I am free to say that Isaac got the lion's share, and that the testator's only daughter, with whom he seems to have had no difficulty, and to whom he had never given more than a very trifling pittance, and who was in need of aid from him, was entirely overlooked, and her claims, when urged by her brother, resisted on what is alleged to be a false ground—that he had given her property in addition to the $100 admitted to have been received. I am unable to account for this unnatural conduct of the father; yet he had the right to withhold from her any part of his property; and all that can be said of it is, that such an unnatural exclusion from a just and equal share of his estate, is a strong circumstance to show either mental incapacity, or undue influence. That Isaac, who had lived with and worked for his father after his majority, for many years, while the other children had left him and set up for themselves; who had treated his parents with kindness during all their lives, caring for them with tenderness and affection amid all the infirmities and trials of age, should have had a large share of the estate, was alike natural and just. How far the bequest is beyond what is just, is not for me to determine.

2d. The circumstances under which the will was made.

Reynolds·v. Root.

These were such as to excite suspicion. The testator had a partial attack of appoplexy, and it was feared that another would wholly incapacitate him for making a will. The scrivener is sent for, and one of the sons takes the feeble and infirm old man into his cutter on a cold, blustering day, on a ride, and they do not return until nearly night, at which time the scrivener is sent for. This conduct is calculated to excite suspicion that the old man is taken away to keep him out of the reach of the other children until the will is finally completed. It is a subject of remark, also, that while the will was being made, it was necessary for one of the sons to be present in order to induce the testator, not to give almost his entire estate to his son Isaac, thus overlooking entirely the claims of his other children. The scrivener seems to have done his duty fairly, and from his evidence it would hardly be possible to infer any undue or improper influence.

3d. The condition of the testator, mental and physical, when the will was made, and his situation in the family of Isaac, to whom he gave the bulk of his estate. It is not to be disguised that the testator was an old man, whose faculties were in some degree impaired; he had lost his wife, and was in a great degree helpless, and therefore dependant entirely, for care and comfort, on his son and daughter-in-law. The son had for years had the exclusive management of his property, and thus in every way had the father under his control. That the influence thus acquired over the father might be wielded for his own personal benefit, is not unnatural. Whether it was, is not for me to say. Before a will made under these circumstances, which gives substantially all to one, is admitted to probate, it is due to those cut off that the case be thoroughly examined.

I do not wish to be understood as intimating the opinion that the will was obtained by undue or improper in-

fluence. All I mean to say is, that it presents a case which should, in my judgment, be submitted to a jury.

So far as the refusal of the surrogate to admit the will to probate rests on the incapacity of the testator, it seems to me it was wholly erroneous, and as the refusal is placed in part on that ground, the only way to do entire justice to the parties is, to reverse the decree and send the question to a jury.

The decree of the surrogate must be reversed, and an issue must be framed and tried before a jury in Herkimer county.

[ONEIDA GENERAL TERM, January 7, 1862. *Bacon, Allen, Mullin* and *Morgan,* Justices.]

