MAGDALENA ROLLWAGEN, Appellant, *v.* FREDERICK
ROLLWAGEN et al., Respondents.

A party offering an instrument for probate as a will, must show satisfacto-
rily that it speaks the language and contains the will of the testator.

Although, ordinarily, the subscription and execution of a will in the mode
prescribed by law are sufficient proof upon these points, yet, where the
testator can neither read, write nor speak, there must be not only proof
of the factum of the will, but that the mind of the testator accompanied
the act; that he knew and understood the contents of the instrument
and that it expressed his will.

Whenever it appears by the facts and circumstances surrounding the tes-
tator, at the time of the execution of a will, that the influence of another
was exercised over him sufficient to destroy his free agency, it is undue
influence and vitiates the will.

The amount of influence which will be held sufficient to invalidate a will
is dependent upon the strength or weakness of the mind of the testator;
however little, if sufficient in the particular case to destroy free agency,
it is undue and vitiates the act instigated by it.

So, also, where one takes advantage of the affection or gratitude of
another to subdue and control his mind so as substantially to deprive
him of free agency, and thus obtains an unjust will in his favor, it is
undue influence.

In 1871, R., an uneducated man of great wealth, a confirmed invalid, hav-
ing nearly lost the power of speech, married plaintiff, his housekeeper.
His infirmities continued to increase, and during 1872, according to the
testimony of his intimate friends he could not utter a word or make an
intelligible sound. In the spring of 1873 the old business agent of R.
was discharged and a brother of his wife, a man of limited business
capacity put in charge of all the property. A large and expensive
dwelling-house was purchased and furnished, and a will was drawn by
an attorney employed by plaintiff's brother, she giving, in the presence
of R., all the instructions in reference to it, claiming to understand the
sounds uttered by him, but none of which were intelligible to the attor-
ney. At the time of the execution of the will, no word or intelligible
sound was uttered by R.. By the will, the new house and lot with the
furniture was given to the plaintiff in addition to what she would receive
as widow. The real estate was not to be divided until the youngest
grandchild, living at the time of the death of plaintiff, should arrive at
the age of twenty-one, and in the mean time the same was placed under
the exclusive control and management of plaintiff's brother, who was
appointed executor. Plaintiff's brother and mother became members
of the family. In September, 1873, a codicil was, in a similar manner,

drawn and executed, by which four other houses and lots were devised to plaintiff in addition to what was given by the will. R.'s children by a former wife were not present at the execution of the will or codicil, and it does not appear that they knew of them. About a month after the execution of the codicil, R. died. *Held,* that probate of the will and codicil was properly refused; that the proof failed to show that the testator understood and assented to the provisions of the instruments; and that the evidence justified a finding of undue influence.

(Argued November 10, 1875; decided January 18, 1876.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, affirming a decree of the surrogate of the county of New York, refusing to admit to probate instruments puporting to be the last will and testament of Frederick Rollwagen, deceased, and a codicil thereto. (Reported below, 3 Hun, 121 ; 5 T. & C., 425.)

The facts sufficiently appear in the opinion.

*Wm. H. Arnoux* and *Wm. A. Beach* for the appellant. The testator sufficiently signified to the witnesses the character of the instruments, and his purpose to execute them as his will. (*Beldiny* v. *Leichardt,* 56 N. Y., 680 ; *In re Kellum,* 52 id., 577.) The testator was mentally qualified to execute a will. (*Delafield* v. *Parish,* 25 N. Y., 9, 69, 97.) There was no evidence that the testator was unduly influenced. (*Clapp* v. *Fullerton,* 34 N. Y., 190, 197; *Jackson* v. *Jackson,* 39 id., 153 ; *In re Tonnele,* 4 id., 140 ; *Gardiner* v. *Gardiner,* 34 id., 155.) Opinions or conclusions of witnesses are not restricted to the topics indicated by the court. (*De Witt* v. *Barbey,* 17 N. Y., 348 ; *Hewlett* v. *Wood,* 55 id., 634 ; *People* v. *Eastwood,* 14 id., 562.) The General Term erred in holding that the right of cross-examination is confined to subjects upon which the witness has been examined by the party calling him. (*Phila. and T. R. R. Co.* v. *Stimpson,* 14 Pet., 448, 461 ; *Houghton* v. *Jones,* 1 Wal., 702 ; 1 Greenl. Ev., §§ 445, 447 ; *Jackson ex dem.* v. *Varick,* 7 Cow., 238 ; 2 Wend., 166 ; *Fulton Bk.* v. *Stafford,* id., 483.) Upon an appeal like the present, this court will examine the whole case upon the facts as well as the law. (*Schenck* v. *Dart,* 22

id., 420; *Howland* v. *Taylor*, 53 id., 627; *Apthorp* v. *Comstock*, 2 Paige, 482.)

*Henry L. Clinton* and *George F. Langbein* for the respondents. On an appeal from the decree of a surrogate the review is in the nature of a rehearing in equity, and the admission of improper evidence on the original hearing will not justify a reversal, if the facts established are sufficient to uphold it. (*Clapp* v. *Fullerton*, 34 N. Y., 190.) If, on appeal, a case depends upon the credibility of witnesses, this court permits the question of credibility to be determined by the tribunal that saw the witnesses. (*Gardiner* v. *Gardiner*, 34 N. Y., 157.) Upon the trial, the facts and circumstances surrounding the execution of the will and codicil as proved by the evidence of the subscribing witnesses, the surrogate was compelled, as matter of law, to refuse to admit either instrument to probate. (*Delafield* v. *Parish*, 25 N. Y., 9; *Tyler* v. *Gadner*, 35 id., 581; *Lee* v. *Dill*, 11 Abb., 214, 219; *Limburger* v. *Rauch*, 2 id. [N. S.], 279.) The surrogate properly excluded proof as to inferences which witnesses drew from the acts and conduct of decedent, in respect to the operations of his mind. (*Morehouse* v. *Mathews*, 2 N. Y., 514; *De Witt* v. *Barleg*, 9 id., 371; 17 id., 340; *Maynard* v. *Beardsley*, 7 Wend., 560; *Mayor of N. Y.* v. *Pentz*, 24 id., 668; *Gibson* v. *Williams*, 4 id., 320; *Jeff. Ins. Co.* v. *Cotheal*, 7 id., 72; *Norman* v. *Wells*, 17 id., 136, 161; *Lincoln* v. *Sar. and Sche. R. R. Co.*, 23 id., 425; *Lamour* v. *Caryl*, 4 Den., 370; *Nellis* v. *McCarn*, 35 Barb., 115; *Seaman* v. *Smith*, 46 id., 320; *Harris* v. *Pana. R. R. Co.*, 3 Bosw., 7; *Vanduser* v. *Young*, 29 N. Y., 9; *Mesner* v. *People*, 44 id., 1; *Clapp* v. *Fullerton*, 34 id., 194.)

Earl J. The decedent was a native of Alsace, now a province of Prussia, and came to this country and settled in New York in the year 1829. He was a butcher by trade, and died at the age of sixty-six years, having amassed a large fortune, estimated at from $600,000 to $800,000, invested

mostly in real estate in the city of New York. He was illiterate, and could neither read nor write, except that he could write his name and read figures. He was married in early life, and of that marriage had three sons and one daughter. His first wife died in 1865. He was married again in 1866, and his second wife died in less than a year, and there was no issue of that marriage. After her death he lived in the family of his eldest son, Frederick Rollwagen, Jr., until 1869, when he commenced housekeeping in one of his own houses. Magdalena Herrman, a niece of his first wife, then became his housekeeper at fourteen dollars per month. His family then consisted of Magdalena, his second son, Louis and his wife, and his youngest son, George. In a month or two, Louis and his wife left and went to housekeeping elsewhere. George, at the age of nineteen, was married in 1871, and in September, 1872, he left and went to California, and then the family of the decedent consisted of himself and Magdalena and a domestic.

His daughter died in 1867, leaving seven minor children. Soon after her death his health began to fail, and he soon became quite hoarse and infirm. In 1871, it was quite difficult for him to speak or walk, and, at times, some of his intimate friends could not understand him when he attempted to talk. In that year, too, the evidence tends strongly to show that he had a shock of paralysis. His condition was such as to require the almost constant attention of some one, and Magdalena gave him that attention with great fidelity. On account of his infirm condition, he had expressed a determination never to marry again. His relations with his children, so far as appears, were at this time amicable and affectionate.

While in this condition, on the 19th day of September, 1871, he was married to Magdalena. He was then sixty-four years old, and she was forty-two. He was very infirm, and she strong and healthy. The marriage was, at the time, unknown to his family, and the ceremony was performed in the presence of but one witness, Mr. Beers, who had, for some

years, been his agent in the management of his real estate. Precisely how the decedent's previous determination not to marry was changed, and how the marriage was brought about, is not disclosed in the evidence; she, the only person living who knew, was not sworn. It does not appear who first suggested the marriage. It does, however, appear that she said that she would not stay with the decedent unless he married her; and, from her statements proved, it is most probable that she was the moving cause of the marriage.

Taking into consideration the age and condition of the parties, we may well conclude that it was not a marriage of affection. At the age of sixty-four, having buried two wives, with a constitution hopelessly shattered, the decedent probably was not influenced by love or passion; she was poor and dependent, and could have had no motive to marry a helpless and broken down old man except his wealth. After his marriage his infirmities continued to increase, and during the year 1872 but few of his friends could understand a word he said or attempted to say.

Mr. Beers continued to be his agent for the management of his real estate until April, 1873. There was no proof that he was not a faithful agent; he had long held his position as such. A short time before the last date, the decedent complained that he was not prompt in the payment over of money collected, and he then appointed Henry Herrman agent in his place. He was a brother of Magdalena. He came to this country in 1854, and was about thirty-three years old. Prior to the time his sister became decedent's housekeeper he was not intimate with the decedent — sometimes seeing him two or three times in a year, and sometimes not seeing him in two years. After the marriage of his sister, his intimacy increased. He was a man of limited means, worth about $2,000. He had kept a small grocery, and done a very small business. Judging from the character of his business, and the measure of his success, we may fairly infer that he was not a man of much capacity.

In June, 1873, decedent sold and conveyed the house in

which he had been living since he last went to housekeeping, and purchased a larger and more expensive house and fitted up and furnished the same. Into this house he moved about the middle of June, and then Henry Herrman and his mother commenced to live with the decedent, and with his wife and a domestic constituted his family.

After this time his children and grandchildren were not often at his house. He then had become, and he thereafter remained, substantially helpless and speechless. His wife had to feed him and care for him, and attend to all his wants and necessities. She and Henry did all his business. She was the agent through whom he acted and communicated with others. She was his constant attendant, and he rarely saw other persons in her absence. No business was done in his name without her sanction, and there is no evidence that, at any time, he resisted her will or failed to comply with her wishes.

A large number of respectable witnesses who had been intimate with him testified that, in the year 1873, he could not utter a word or make an intelligible sound, and that they could, therefore, hold no communication whatever with him. When spoken to he would make a nasal sound, and nod or shake his head; but the sound was unintelligible, and the motion of his head had no certain meaning as he had when in health the habit of moving his head when talking, nodding when he did not mean yes, and shaking it when he did not mean no.

According to the evidence of these witnesses, as he could neither read nor write, nor make any intelligible sound or sign, there was no mode by which he could communicate his thoughts or wishes. When these persons attempted to communicate with him, his wife pretending or assuming, in some way, to understand his thoughts and wishes, was the organ through whom he spoke. She would say to others what she claimed, by listening or looking at his lips, he would say to her.

On the contrary there are respectable witnesses who testi-

fied that, during the year 1873, to the time of his death, they conversed with him and could understand what he said, but generally with great difficulty. The evidence of these witnesses, on both sides of the question, was so thoroughly criticised and commented on in the opinions of the surrogate and of the judge at General Term, that it would serve no useful purpose to go over it again. The evidence appears to be irreconcilable. It may be that some of the witnesses for the proponent mistook or misremembered Mrs. Rollwagen's language for that of her husband. It may be that he could speak at some times and not at others; but this does not seem very probable. It would seem when intimate friends and business men called upon him at different times in every month, under circumstances when he would speak if he could, and uniformly found him unable to utter any intelligible sound, and when their evidence is confirmed by that of the physician who attended him in his last sickness, and who testified that from paralysis he had been unable to speak, that there could be no mistake in the conclusion to be drawn. But, for reasons presently to be stated, I do not think it important to determine whether he was, at all times during the year 1873, entirely speechless or not. While in this condition, on the 17th day of June, 1873, he executed the will which was offered for probate. Prior to this time he had repeatedly declared that he should give all his property to his three sons and the children of his daughter equally, his daughter's children taking one part.

Prior to the summer of 1873, Mr. Gussenheimer, an old and respectable lawyer, who was admitted to practice in 1846, had been his attorney and counsel in all his business except when he was absent from the city. He drew a will for him in 1854, another in 1860, and either drew another will in 1868 or 1869, or was consulted about one. He was an old acquaintance of thirty years' standing. It is not disclosed in the evidence what either of those wills contained.

Some time after his last marriage, prior to the fall of 1872, the particular time not being shown, a lawyer by the name

of Rosenstein drew a will for the decedent. None of the circumstances attending the execution of that will are shown, and its contents are not shown with certainty. Mrs. Rollwagen was a beneficiary in that will, but to what extent is not certainly known. The evidence tends to show that she was a devisee therein for life of the house in which they lived prior to June, 1873, and that Beers, his old agent, was appointed one of the executors.

It is not disclosed how Rosenstein, rather than his trusted counselor, Gussenheimer, came to be employed to draw the will. The last will was drawn by Mr. Bellesheim, who had known decedent about ten years, who had been admitted to practice five or six years, and who had probably in · the absence of Gussenheimer drawn a few papers relating to real estate for the decedent prior to that time. He had not, however, been consulted by him as his legal, professional adviser. Henry Herrman was the messenger who invited him to come to the house of the decedent. He went there and found Mrs. Rollwagen there with the decedent. He attempted to talk with him and found him entirely speechless, and unable to utter a single intelligible sound. Mrs. Rollwagen told him what she claimed decedent wanted; that he wanted to change the Rosenstein will by giving her the last house purchased in the place of the house which had recently been sold, and by omitting the name of Beers as executor; and she gave him that will from which, with these alterations, to draw the new one. All the instructions came from her. After he had drafted the will, Henry Herrman having in the mean time called upon him, he again went to the house of the decedent on the seventeenth day of June and found there beside the decedent the other witnesses and Henry Herrman and his mother. He testified that the decedent then went through the form of executing the will; that either alone or with the help of some one present he signed the will after it was read in his hearing; that he made the publication of the will and the request to the witnesses by an unintelligible sound and nodding his head in answer to questions put by

him, but that he uttered no word or sound which he understood.

The other witnesses were Dr. Goulden and Mr. Theisz. Dr. Goulden was an Alsacian, who came to this country in 1860. He was first employed professionally in the Herrman family, and became acquainted with the decedent in 1870, when he was called to see Magdalena, then decedent's housekeeper. He was also Henry Herrman's physician, and after he had been introduced into the decedent's household he became his physician and visited him in that capacity occasionally. He was requested to be present as a witness at the execution of the will, by Magdalena, and his account of what took place at the execution of the will does not differ materially from the account given by Bellesheim. Mr. Theisz was an undertaker, had been acquainted with decedent about twenty years, and was a near neighbor. He had never visited at decedent's house until Magdalena became his housekeeper. She called upon him the day before to be present as a witness to the execution of the will. He differs from the other witnesses as to what took place at the execution of the will, and says that the decedent used words and language which could be plainly understood; but the other two witnesses had equal opportunity for seeing and hearing what was said and done, and are at least equally credible, and hence their version of the transaction ought to be taken as the true one. Neither of these persons were witnesses to any of the prior willls.

By this will he gave to his wife, in fee, the new house which he had then recently bought, all the furniture therein, and one-third of all his personal property. He also gave her one-third of the net rents and income of his real estate, to be paid to her by his executors monthly; and these provisions for her were in lieu of dower. He gave to his three sons, each one-quarter of the remainder of his personal property; and he gave to the children of his deceased daughter one-quarter, to be invested in mortgages upon real estate, and paid to them by his executors, with accumulation of interest

as they respectively reached the age of twenty-one years. There was no provision to pay these grandchildren any of the principal or interest until they respectively reached the age of twenty-one years. He ordered that the remaining portion of the net rents and income of the real estate should be divided into four parts and one part paid monthly to each of his sons; and one part he directed to be invested by his executors for the benefit of the children of his deceased daughter, in mortgages, to be paid to them as they respectively reached the age of twenty-one years. He further ordered that his real estate should not be sold, disposed of or divided during the life of his wife, and not after her death until his youngest grandchild then living should have attained the age of twenty-one years. The sale or division of the real estate is thus postponed for an indefinite term. If his widow should live thirty years, and if at her death his youngest grandchild was a year old, the postponement would be fifty years. He appointed his wife and his son Frederick, and Henry and George Herrman, his wife's brothers, executors of his will; and provided that Henry alone should let and rent all his real estate (except the house devised to his wife), and collect and receive the rents therefrom; and that after paying and deducting therefrom the yearly taxes, water-rents, assessments, necessary repairs and three per cent for his commissions on the gross amount collected, he should deposit the balance, jointly with the executors, in some savings bank designated by the executors, or a majority of them, to be afterward divided as directed in the will.

It will be seen that a large discretion is given to Henry; he alone was to take charge of real estate estimated to be worth from $600,000 to $800,000. He was to let the same, determine what repairs were to be made and make them; he was to receive about $40,000 annually in rents, and receive commissions amounting to about $1,200 annually, possibly, and not improbably, during his entire life. This was certainly a fine provision for a single man who had reached thirty-three years of age, without accumulating much prop-

erty or evincing much business capacity. He was secured an income, practicably for life, probably larger than he had ever received in any business in which he was engaged.

George Herrman, another of the executors was, or had been, a baker and keeper of a lager beer saloon, probably a man of limited means and capacity. It does not appear that he was a man in whom the decedent had specially confided when in health. With three of the Herrman family united with him, Frederick's influence as executor might or might not be of much account. Why Frederick, the decedent's eldest son, who was nearly forty years old and apparently a reputable man, was not placed in the responsible position given to Henry does not appear.

From the execution of the will until about the first day of September thereafter, there is no evidence from witnesses who claim that the decedent could talk, that he ever mentioned the subject of the will. About that time Henry Herrman again called upon Bellesheim to come to the house of the decedent, and he soon after came, and then, as before, he could hold no conversation with the decedent. He was informed by Mrs. Rollwagen that he desired to add a codicil to his will and provide for a child, if she should have one by him, and give her four houses. After receiving the instructions from her and getting his assent to them by the usual nod of his head, he left, and on the fifth of September he returned with the codicil drawn. Dr. Goulden and Theisz were again there, their attendance having been procured by Mrs. Rollwagen. The codicil was executed in the same way that the will was, the decedent not being able to utter a word that the witnesses could understand. In the codicil, after reciting the provisions which he had made for his wife in his will, he says: " Whereas, it is my desire that my beloved wife should be better provided for, I do, therefore, give, devise and bequeath unto my said beloved wife " the four houses and lots in addition to what he had given to her in his will, and he made provision that any child she might have by him should share equally with his other children in all his property.

After the codicil was executed, so far as is disclosed in the evidence, the decedent never spoke of either the will or codicil to any one except Henry Herrman. He testified that decedent informed him that he had made a codicil to provide for the child which was then expected to be born of Mrs. Rollwagen, and which was subsequently born on the twenty-seventh day of November, and is still living.

It does not appear that his children knew of either the will or codicil. None of them were in his house when they were executed, the only persons there being the sub-scribing witnesses, the wife, and the Herrmans, brother and mother.

A little over a month after the execution of the codicil he died. Magdalena, her brother Henry and her mother were present at his death, but no relative of his blood. She knew that he was dying, and when the suggestion was made to her to send for his sons Frederick and Louis, who lived near, she refused to have them sent for upon the pretence that the dying father did not want to see them. The first person notified of the death was her friend Mr. Theisz, the under-taker, one of the witnesses to the will.

I have thus alluded to the salient features of this case as dis-closed mainly by the undisputed evidence. In 1869, we find Magdalena installed in the house of the decedent, then advanced in years and infirm and broken in health, as his housekeeper, at fourteen dollars per month. In about two years, during which time he had become more infirm, requir-ing her constant attention, he is reluctantly induced into a marriage with her, neither love nor passion presiding at the nuptials. She continued thereafter to render to him as wife the services which she had before rendered as servant. She is elevated from a condition of dependency to that of a mis-tress of a home of wealth. Her husband's real estate is so great and valuable that she is assured at his death, which could not long be postponed, of a dower right equal to an annuity during life probably of not less than $12,000. Not satisfied with this, in less than a year a will is made in which she is a

devisee of a house for life, and all the furniture therein. His old friends and family are isolated from him; his old agent, trusted for years, the only witness of his last two marriages, is discharged, and her brother appointed agent in his place. His dwelling-house is sold, and a more expensive house is purchased and furnished, the negotiations being mainly conducted by her. Her brother and mother become members of his household. He becomes substantially speechless and helpless, and then an attorney is engaged by her brother to draw another will. She gives all the instructions as to the contents of the will, and selects the witnesses. The will is executed, when neither of the witnesses could understand with certainty a sound or sign made by him. In this will she gets, in addition to the munificent provision which the law would make her out of his immense real estate, the last dwelling-house purchased in fee, and all the furniture therein, and one-third of all the personal property. Besides this, she and her two brothers are appointed executors with his son Frederick, and are thus placed in practical control of the estate; and the real estate is locked up, and the key committed to the custody of her brother Henry, who, for his agency over the same, is secured an annuity probably of $1,200 per year possibly for life. This will is a secret to his blood relatives. In less than three months, on the pretence that provision must be made for her child then unborn, Henry Herrman engages the same attorney to draw a codicil. The instructions again come from her, claiming to speak for her speechless husband, and while we have no hint that he meant by the codicil to do any thing except to provide for the unborn child, she is first mentioned in endearing terms, and a desire expressed that she should be better provided for, although provision had already been made for her which would furnish her an income which she could not reasonably spend, and she gets four houses and lots more. In about a month, the last scene in a somewhat eventful life is reached, and he dies, leaving her a widow after two years of married life. She then, with her brother, presents this will and codicil

for probate as the last will of the decedent, and seeks to uphold the same. Should they have been admitted to probate?

The decedent probably had sufficient mind to make a will, and this is not denied by contestant's counsel. His mind was, however, undoubtedly impaired, and his will enfeebled by paralysis and disease; to what extent we are unable to determine. If, therefore, the only objection to the probate of this will was mental incompetency to make it, the objection could not prevail.

A party who offers an instrument for probate as a will must show satisfactorily that it is the will of the alleged testator, and upon this question he has the burden of proof. If he fails to satisfy the court that the instrument speaks the language and contains the will of the testator, probate must be refused. The laws in reference to the distribution of the estates of persons dying intestate are founded upon principles of public policy and justice, and must regulate the transmission of property unless a person before death has in the mode prescribed by law himself provided how his property after his death shall be disposed of. As said by Judge DAVIES, in *Delafield* v. *Parrish* (25 N. Y., 9, 35): "It is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved and great difficulties oppose themselves to so doing." And this was substantially the language of Lord BROUGHAM, in *Santon* v. *Williams* (2 Curt., 530). Ordinarily, when a testator subscribes and executes a will in the mode required by law, the fact of such subscription and execution are sufficient proof that the instrument speaks his language and expresses his will; but when a testator is deaf and dumb, or unable to read or write and speak, something more is demanded. There must then not only be proof of the factum of the will, but also that the mind of the testator accompanied the act, and that the instrument executed speaks his language and really expresses his will. This will is somewhat complicated in its terms, and I am satisfied that there was no time in the year 1873 when the

decedent could utter the words or give expression to the language therein contained. Even if, according to some of the evidence, he could at times talk some, it was only at intervals and to a limited extent. However it may have been at other times, he could not talk or utter an intelligible sound on the days when the will and codicil were executed, and the attorney who drew the will could not hold any conversation with him and received all his instructions from his wife. It is true that the will and codicil were read to him and that he is claimed to have assented by the nod of his head and the nasal sound without meaning, but it was shown that when in health he had a habit of nodding his head when he did not mean assent, and hence that furnished no certain indication of his assent to what was read.

The will disposes of a large estate in a method by no means simple and direct; and the proof that he understood and assented to its provisions should be quite clear and satisfactory before it should be admitted to probate. (*Barry* v. *Briton*, 1 Curtiss, 639; *Chaffee* v. *Baptist Miss. Conv.*, 10 Paige, 90; *Boyd* v. *Coofe*, 3 Leigh, 205; *Van Pelt* v. *Van Pelt*, 30 Barb., 134; *Longchamp* v. *Fish*, 5 Bos. & Pull., 415.) It is said, in 1 Jarman on Wills, 29: "That in proportion as the infirmities of the testator expose him to deception, it becomes imperatively the duty and should be anxiously the care of all persons assisting in the testamentary transaction, to be prepared with the clearest proof that no imposition has been practiced, but that the testator did in fact fully understand every portion of the paper which he executed as his will." In *Weir* v. *Fitzgerald* (2 Brad. Sur. R., 42), the learned surrogate says: "Something more is necessary to establish the validity of the will, in cases where, from infirmities of the testator, his impaired capacity or the circumstances attending the transaction, the usual inference cannot be drawn from the mere formal execution; additional evidence is therefore required that the testator's mind accompanied the will; that he knew what he was executing and was cognizant of the provisions of the will." Satisfactory

evidence of this kind has not been produced in this case, and hence probate was properly refused.

But if we assume that the will and codicil were formally executed, and that the mind of the testator accompanied the act, and that the contents of the instruments were known to him and assented to by him, probate would still have to be refused on account of undue influence.

It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue*, in the sense of the law, when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case. (*Lynch* v. *Clements*, 24 N. J. Eq., 431.) But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it. In 1 Jarman on Wills, 36, it is said: " That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired."

The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person. (*Marvin* v. *Marvin*, 3 Abb. Ct. of App. Cas., 192; *Reynolds* v. *Root*, 62 Barb., 250; *Tyler* v. *Gardiner,* 35 N. Y., 559; *Forman* v. *Smith*, 7 Lan., 443;

*Lee* v. *Dill*, 11 Abb. Pr. R., 214; *Dean* v. *Negley*, 41 Penn., 312.)

It is not sufficient to avoid a will that it is obtained by the legitimate influence which affection or gratitude gives a relative over the testator. A competent testator may bestow his property upon the objects of his affection, and he may, from gratitude, reward those who have rendered him services, but if one takes advantage of the affection or gratitude of another to obtain an unjust will in his favor, using his position to subdue and control the mind of the testator so as, substantially, to deprive him of his free agency, then the fact that affection or gratitude was the moving cause makes it no less a case of undue influence.

In this case, in the space of about a year, we find the testator executing three successive instruments, in which the share of his wife goes on increasing. We cannot presume that his bounty to his wife and her relatives was prompted by affection. On his part his marriage was a matter of convenience, and he had lived with his wife less than two years when the last instrument was executed, and less than one when the first was executed. It is not a case where husband and wife had lived together for years after a marriage prompted by mutual affection, which had been increased by years of tender care and a thousand acts of love and kindness, until the husband deemed no bounty he could bestow upon his wife too great. It is a case of a scheming woman marrying an old man, her uncle, broken in body and enfeebled in mind, and then scheming to secure an undue share of his property for herself and her relatives. We cannot presume that the testator was influenced by gratitude. It is true that she rendered him faithful and valuable service. She was diligent and kind in her constant attention to his wants; so she was before her marriage at fourteen dollars per month. By his marriage with her he had elevated her to a condition of independence, and had secured to her, by operation of law, an income for life far in excess of her reasonable wants. A change from fourteen dollars per·

month to $12,000 per year, was certainly all the reward which mere gratitude would prompt or be expected to bestow. How then is this will to be accounted for? She was the constant attendant of the testator, his only organ of communication with others. He was entirely dependent upon her for all his wants. She procured the appointment of her brother as his agent, and thus had the entire control and management of his estate. She introduced her brother and mother into the household, and his own children, although not formally shut out of his house, were probably not welcome visitors, judging from the death-bed scene when she refused to send for them to see their dying father. Upon all occasions, so far as disclosed in the evidence, he was submissive to her will. She procured the will to be drawn, instructed the scrivener and had it executed when he was speechless. Besides the large bounty conferred upon her the *corpus* of the estate is tied up and placed in the control of her brother. She was alone with him and had every opportunity, in the helpless condition of his body and the enfeebled condition of his mind and will, to impose upon him and to subdue him entirely to her will. We have no direct proof of what she did, because no witnesses were present and she was not sworn. These and the other circumstances above alluded to, and all the inferences to be drawn from the immense mass of evidence given before the surrogate, convince us that this will and the codicil were the result of undue influence, imposition or fraud of some kind and that they should not be admitted to probate. It matters not that she did not take for herself and relatives a larger share of his estate. She took enough to show her grasping disposition and overpowering influence.

I freely admit that there are some difficulties standing in the way of the conclusion which we have thus reached, and that strong arguments were urged with great ability for the proponents by their learned counsel, but the difficulties lying in the pathway of the proponents are still greater. An immense estate should not be disposed of by a will more or less unjust and tied up by complicated provisions, except

upon clear and satisfactory proof that it is really the will of a competent testator exercising his free agency. As said by Lord BROUGHAM, in *Santon* v. *Williams* (*supra*): "It is much less material that those who seek to impeach a testamentary instrument should be unable to explain certain things in their case and should be forced to admit that their argument is not, in every point, consistent with all the facts, than that they who seek to establish the will should give no rational, consistent or intelligible solution of those difficulties which incumber their supposition and obstruct the path toward the conclusion they would have us arrive at."

Our attention is called to certain rulings of the surrogate excluding questions put to witnesses by the counsel of proponents, and the claim is made that gross errors were committed prejudicial to the proponents. I have carefully considered all of them and believe that most of the rulings were clearly right, and if any of them were wrong they were not of such a character as materially to affect the case and, hence, are not grounds for reversal upon this appeal. (*Clapp* v. *Fullerton*, 34 N. Y., 190; *Gardiner* v. *Gardiner*, id., 155, 164.)

The judgment must be affirmed, with costs.

All concur; ALLEN, J., concurs on first ground discussed, and also on the ground that the proof did not show a due execution and publication of the will; FOLGER, J., concurs on first ground.

Judgment affirmed.