NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—APRIL, 1877.

## MCLAUGHLIN'S WILL.

*In the matter of the Probate of the last Will and Testament of* WM. P. MCLAUGHLIN.

Intemperate habits, enfeebled condition and eccentricities do not disqualify a testator, unless his mind is so affected as to render him incapable of comprehending the condition of his property, or his relations to the persons who were or should be the objects of his bounty, or the scope and bearing of the provisions of his will.

Unjust prejudices and unreasonable jealousies, influencing the testator against a child, are not (there being no question of undue influence) sufficient to avoid the will.

If it does not appear, but that the habitual drunkard was always able to talk coherently and understand what he was about, and it appears that he was entirely rational when the will, drafted by himself, was executed, it should not be rejected.

THIS was a proceeding for the probate of the last will and testament of William G. McLaughlin, deceased.

Numerous objections to the probate were filed by Maria S. Moffatt, one of the daughters of the deceased, who received a bequest of but $100. The widow received $3,500, and the testator's daughter Zillah, and a son Alfred, were made residuary legatees. Several other bequests preceded the above, and by a subsequent clause he provided that certain deposits in Savings Bank in his name in trust for his daughter Zillah, and son Alfred, should belong to them respectively.

SMITH & WOODWARD, *for proponent.*

M. B. FIELD, *and others, for contestant.*

THE SURROGATE.—On the submission of the case, no question was raised as to the due and formal execution of the will in question, but it is claimed by the contestant's counsel, that the testator was not competent to make a will at the time the instrument propounded was exe-

ented, on account of his intemperate habits and mental imbecility or derangement, and it is only necessary therefore, to refer to the testimony of the subscribing witnesses, so far as it relates to the mental condition of the testator, at the time of such execution, who testified upon that subject that the testator was of sound mind, memory, and understanding. The will was executed on the 21st day of May, 1875.

Charles P. Buckley, a subscribing witness, testified, that he was an attorney, and drew the will in question; that deceased was a searcher in the office of receiver of taxes in the city of New York, and spoke to him several times about drawing his will; that he had an interview with the deceased at witness' office on the subject within a week of the time when he drew the will; that he drew a draft and sent it to deceased who brought it back, and it was then engrossed; that he thinks there was one interlineation of a word, which did not indicate anything in particular; that the interview before making the draft of the will continued about two hours; that there were certain amounts left blank in the memorandum thereof furnished by the testator, which were filled up, but the scheme of the will was unchanged; thinks there was a blank in the amount given to the widow, but not as to Mrs. Moffat; that the draft was delivered to the testator for examination the day before the will was executed; that the testator read over the will as executed in the presence of witness. After its execution it was put in an envelope by the deceased, who wrote his name thereon, and left it sealed up, with the witness, and that the paper continued in his possession until testator's decease when he gave it to one of the executors. Witness said he never saw anything to indicate that the deceased was a person of improper habits. David M. Adsall

the other subscribing witness testified among other things, that he had known deceased about six years; that he engrossed the will in question, and testified to the formal execution of the will.

Iduella McLaughlin, called for contestant, testified that she was the widow of deceased, was married to him September 16th, 1872, that she knew deceased when he was a young man, when he was a very lively and gay person; that his habits became intemperate; that he was a steady drinker; had seen him intoxicated, but it was not of frequent occurrence, it was not of daily occurrence. About a year and a half before his death, in May, 1875, he began to be quite feeble, and left business in June; went away for his health; attended to business daily until that time; there was a gradual failure of his system; noticed it about the last of May, or first of June; the disease was in the nature of consumption; he was emaciated; he was naturally a lively person, and at times was of excitable temperament; he was sometimes very abusive, as the result of intoxication, he, was violent at these times; that at one time she found him crouched in the corner of a dark room in his house about ten o'clock in the evening, he was warming his hands at the heater, that was in the year 1875, before June; did'nt know that the testator had hallucinations. Deceased supplied his family very limitedly; cannot say that he gave them what was necessary; has brought home improper, decomposed food; that was, she thought in the fall of 1874; it occurred on many occasions; he went out of town for his health to New Baltimore; witness was with him until he died; was confined to his room and bed; that she never had any knowledge of his having made a will; heard it the next day after his burial.

On cross-examination, the witness testified that the

family when she was married, consisted of testator's son William, his daughters, Maria and Zillah, and his son Alfred; that William died in January, 1874; that Maria is married, she resided at home till February, 1875; deceased was not present at the marriage; never knew testator to drink in the morning; had seen him under the iflnuence of liquor on Sundays when he would be at home; he was in the habit of drinking when he was at home, in the evening always; he attended to his business until June sixth, 1875; that when she found him in the parlor as described, he was under the influence of liquor, but not to excess; he knew what he was about, she never saw him so intoxicated, that he did not know what he was about; that he was a very nervous man; that when he was found at night in the parlor, he was watching to see if his son-in-law, Moffatt, came to the house; he had forbidden him the house; he wanted to see if he visited it.

Maria Moffatt, called for contestant, testified that she lived at home until her marriage in February, 1875, since then has lived in Brooklyn, but visited home; that her mother died in January, 1872; that her father remarried in September, 18˙2; that her age was twenty-eight years; that her step-mother died November ninth, 1875; that she worked at home till her marriage; did servant's work; that there was a servant for the first few years, but not for ten years before she left home; that her father used intoxicating liquor all his life-time; for the last few years used it to a great excess, three of four years before she left home; it made him very quarrelsome, ugly, he found fault with the family constantly; when he came home in the evening he would be pretty well under the influence of liquor, cross and quarrelsome; would drink after he came home; used to have liquor concealed behind a box, which he sup-

posed good folks didn't see, in his room near his desk; would drink of it occasionally during the evening; would find fault with trifling things; when he got entirely under the influence of liquor he would perhaps be unable to speak plain, and could not read; would come home very late at night for about a year before she left home; sometimes so that he couldn't get into the house, and she opened the door for him, and in going up stairs he had to hold himself by the railing; he looked very pale, and very bad; after such occasion his room was in a very filthy condition, she had to take care of it; that she had seen him drink in the morning frequently; kept liquor in his closet in bottles and demijohns; principally whiskey; she had seen him drink twice or three times in the morning; he usually laid abed all day Sunday, and drank continually; that the last year she remained at home, he was very feeble, travelled very slowly; very often pale, looked like a walking corpse. He would say, and do things, and afterwards deny it; did not seem to remember; would frequently deny things that he had just said.

On cross-examination, the witness testified, that from the time of her father's marriage to her leaving, she was away two or three times, two or three weeks at a time; was away the entire month of February at Stamford, Connecticut; there were six persons in the family, the others helped her, but that she did the principal work; that she was in the habit of waiting for her father until he came home at night at 11 or 12 o'clock, as a general thing, for the last year that she was at home; that before that time he was in the habit of coming home between 6 and 8 o'clock; that she had seen him drink on Sundays, a dozen times a day; that her father was 65 years old when he died; that her

father did not approve of her marriage; he would be restless at night, and make a noise; that the family would be kept awake by the noise, and were afraid he would do dangerous things, and would watch him; heard him speak to the rest of the family; would make his threats; give his opinion; that is the reason she supposed her father was opposed to her marriage; that after marriage, on her return from Stamford she saw her father; that he was pleasant, said nothing disagreeable, thought he had been drinking some; that she had not seen him since; that his objection to her marriage was that her husband was poor.

Phineas H. Kingsland, called for the contestant, testified: that he was employed as examiner, and searcher, in the Comptroller's office in the city of New York; knew the testator at lease twenty years; was a searcher in the tax office; that testator frequently employed witness make searches for the assessments; that he was in the habit of meeting him almost daily; considered him a very frequent drinker; especially in the latter part of the period; for nine or ten years seemed to be under the influence of drink pretty much every day; never in such a condition that he could not go about; when under the influence was talkative and sometimes violent, in his expressions; was apt to be more excitable under the influence of liquor; towards the latter part of his life was a good deal affected by the habit of drinking; seemed to be in frail health; went up and down stairs with great difficulty; during the last year of his life, fell away in flesh, the face became thin and haggard; thinks he was weakened in body and intellect, but seemed tolerably capable of pursuing his routine duties; during the last year, while he was in the office, he seemed to be very irritable, and said, and did a great many things, that would cause merriment, especially if he was irritat-

ed by others; his condition was such that his remembrance left him, because of his prostrated condition; witness did not employ him to make searches; it was his impression his mind had become weakened to a very great extent; never felt that he was irrational, or entirely irrational; this applies to his condition at any time during the latter period of his life, the last year, whether under the influence of liquor or not; witness considered him an habitual drunkard.

On cross-examination, witness said he never saw him drunk, but once or twice; never saw him when he seemed to be incompetent to take care of himself; that he thought he was a man of rather excitable temperament, quick temper; that he meant that his intellect was not quite so vigorous as it used to be.

The contestants here rested.

Joseph Farrington, a witness called for the proponent, testified: that he was a physician, and had been for twenty years, and attended the testator from the 2d of November, 1867; saw him occasionally at his own house, occasionally met him in the street, and at his office; had attended upon him personally, and upon members of his family; the last visit he made to him was on July 6th, 1875; visited him on the 2d and 6th of July; that so far as he had occasion to judge from conversation with him, he never saw anything that indicated any unsoundness of mind; he made no particular examination except as to his illness; died of lung disease; was occasionally in the habit of visiting the family; usually visited the deceased in the morning. This witness was a general practising physician.

John G. Bolen, a witness produced for the proponent, testified: that he knew the deceased in his lifetime over sixty years intimately, very intimately; saw him every two or three weeks; he called to see witness

occasionally at his place of business; the last time
he saw him was about the middle of May, 1875;
had a conversation with him; met him . . . in the
street; looked feeble; asked him about his family;
asked him if he had made his will; he said "No."
Witness said he would advise him not to let twenty-
four hours go over his head, before he made a will;
he said he would think of it; saw nothing in his con-
versation, or conduct, irrational; previously he had con-
versed with him about the terms of his will; three
or four years before he died he told him how he was
going to make it; that he intended to cut off his daugh-
ter Maria, and stated the reason, that he would some-
times go home, and find Maria away for two or three
weeks at a time, and he didn't know where she was;
that she would frequently go out with this young man;
that he decidedly objected to the young man because
of his lazy habits; was too lazy to earn his own living,
and if she married him he would cut her off; she married
him afterwards; he told witness that several times, at
different interviews. Witness further testified that he
had advised the widow in respect to this probate; that
he advised her to take what her husband left her.

Seymour B. Moody, produced for proponent, testi-
fied as follows: that he was employed in the Bureau of
Water Rates; knew the deceased some eight or ten
years; had business intercourse with him; for the last
four or five years—probably every week—making
searches; conversing about buiness in the office; con-
versed with him frequently; that he seemed perfectly
rational.

On cross-examination, he testified that deceased
used more or less liquor; but witness never saw him
intoxicated; usually saw him in business hours; saw
him when he knew he had been drinking—frequently

a daily occurrence—for the last two or three years of his life; the last year of his life, he was very feeble in health, thin, quite emaciated, complexion bad, moved but slowly; was a very excitable person, unusually so.

Isaac O. Rhines, for proponent, testified: that he was a tax searcher; had been so for twenty years; knew the deceased about seventeen or eighteen years before his death; in the habit of seeing him almost daily; had desks in the same office; conversed with him very frequently in reference to tax searches, and other matters; he was rational; was sometimes eccentric.

On cross-examination, he testified that towards the last of his life, testator was very weak, and pale; at times moved with a great deal of difficulty; the business of the office was usually routine.

John S. Vredenburgh, for proponent, testified: that he was connected with the tax office, since 1847; knew the deceased since 1856; had frequent intercourse with him in a business way; we consulted as to what was proper to be done in particular matters as to searches; he seemed to be rational. In the Spring, of 1875, he appeared as usual; cannot say he ever saw any indication of his being irrational; he was excitable, headstrong; in the Spring of 1875, he was very much emaciated, looked very sick, hardly fit for business; he was very excitable, particularly when contradicted in argument; it was peculiar to him; he was in a bad way as long as witness had known him, but latterly was more excitable; his bad health appeared in his actions; when he was in these excited conditions, perhaps he was irrational to a certain extent.

This is substantially all the material testimony that bears on the questions involved in this probate.

In *Van Guysling* v. *Van Kuren* (35 *N. Y.*, 70) Justice

SMITH, (delivering the opinion of the court) cites with approbation, the language of Judge Davies in *Delafield* v. *Parish* (25 N. Y., 9), to the effect, that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relation to the persons who were, or should, or might have been the objects of his bounty, the scope and bearing of the provisions of his will.

He must in the language of the case have sufficient active memory to collect in his mind, without prompting the particulars, or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relation to each other, and be able to form some rational judgment in relation to them.

A testator who has sufficient mental power to do these things is within the meaning, and intent of the Statute of wills, a person of sound mind and memory, and competent to dispose of his estate by will.

The testimony in this case notwithstanding the habits, and eccentricities of the testator, leaves no doubt in my mind, that his mind was not so affected by his habitual intemperance as to render him incapable of comprehending the condition of his property, or his relation to the persons who were, or should have been objects of his bounty, or the scope and bearing of the provisions of his will.

In *Peck v. Carey* (27 N. Y., 9), it was held that habitual intoxication, not the actual stimulus of intoxicating liquors at the time of executing the will, incapacitated the testator unless the excitement were not such as to disorder his faculties, and pervert his judgment.

*Shelford on Lunacy*, at p. 364, says: " Intoxication is, in truth, temporary insanity ; the brain is incapable of performing its proper functions, there is temporary

mania but that species of derangement when the exciting cause is removed, ceases, and sobriety brings with it a return of reason. In order to avoid a will made by an intemperate testator, it must be proved that he was so excited by liquor, or so conducted himself during the particular act, as to be at that moment legally disqualified from giving effect to it."

In *Lewis* v. *Jones*, (50 *Barb*, 645,) it was held, an habitual drunkard though subject to the control of a commission was not necessarily incapacitated from making a valid will. There is no doubt that the intemperate habits of the deceased, had to some extent affected his physical health, and his temper, and it may be his mental capacity, so that if there were evidence showing undue influence, that condition of mind would be the subject of consideration as to the effect of that influence upon his mind, and his disposition of his property, but in this case there is not even a suggestion of undue influence upon the deceased in respect to the will in question, or any of its provisions, and the argument of the contestant's counsel against the probate seems to be based upon the allegation of injustice to his daughter, Mrs. Moffatt, who, it appears had been attentive, and faithful in her service to her father and his family, but the proof also shows that she was married against his will, and that he threatened to disinherit her because of such marriage.

In *Clapp* v. *Fullerton*, (34 N. Y. 190,) it was held, that it was not sufficient to justify the rejection of a will, that the testator in other respects competent, entertained a mistaken idea that one of his daughters was illegitimate, if it was not the effect of insane delusion, but of slight, and inadequate evidence, acting upon a jealous and suspicious mind. In that case, Justice PORTER says: " The right of a testator to dispose of his estate

depends neither on the justice of his prejudices, nor the soundness of his reasoning; he may do what he will with his own, and if there be no defect of testamentary capacity, and no undue influence, or fraud, the law gives effect to his will though its provisions are unreasonable and unjust."

In *Seguine* v. *Seguine*, (3 *Keyes*, 663), Justice WRIGHT says: "But if the son had been wholly disinherited, not in favor of the brother, but of parties strangers in blood to the deceased, it would be no ground of itself for avoiding the instrument. A man has a right to make whatever disposition of his property he chooses, however absurd, or unjust."

"A disposing mind," said CRESSWELL, J., in *Earl of Sefton* v. *Hopwood* ( 1 *Fost. & Fin.*, 578), "does not mean that he should make what other people think a reasonable will, or a kind will, because by the law of this country he has absolute dominion over his own property, and if he, being in possession of his faculties, thinks fit to make a capricious, harsh, or cruel will, you have no right to interfere : that would be to make his will for him, and not allow him to make it."

In *Reynolds* v. *Root* (62 *Barb.*, 250,) JUSTICE MULLIN says: "It is a mistake to suppose that the testator is bound to make a will that others acquainted with him and his situation, may deem best. No greater injustice could be done in many instances by a testator than to so dispose of his property as to be what the world would call just."

When the law authorizes a person to make such a disposition by will of his property as he chooses, it presupposes that a person of sane mind may be influenced by unjust prejudices, and inexcusable jealousies, but it does not authorize the court to make a will for him or justify its refusal to probate, because it seems unjust.

The reason alleged by the testator for his discrimination against his daughter Mrs. Moffatt, seems entirely unjust, and puerile, and yet in the exercise of his lawful right he had authority to make just such an unworthy discrimination.

Notwithstanding the intemperate habits and eccentricities of the testator, I should hesitate to deny the probate of this will if the testimony of any single witness were uncontradicted in respect to the effect of his intemperate habits upon his mind, as there is no witness who testifies, that he was ever observed to be incapable of taking care of himself, when most under the influence of liquor, and the general scope of the testimony is, that he was always able to talk coherently, and to understand what he was about, and the testimony of the subscribing witness abundantly shows that he was entirely rational, when he executed the will. The terms of the will itself having been drafted by the testator, I think gives strong evidence of a sound, and disposing mind; and in the disposition of the question this court can not safely allow, either its sense of justice towards, or sympathy for a neglected child to influence it to set aside the intent, and will of a sane testator.

Decree admitting the will to probate accordingly.