In the Matter of the Estate of ALICE L. ROSE, Deceased.

Surrogate's Court, New York County, December 4, 1930.

*Herbert W. Hall,* for the proponent.

*Earl D. Deremer,* for the contestants.

*John J. Cronin,* special guardian.

O'BRIEN, S.   This is a motion to set aside the verdict of the jury on the ground that it is contrary to law and against the weight of evidence.

Grover D. Altman, a lawyer, and a lover of decedent, a maiden lady fifty-eight years old, cultured, refined and of superior education, though in looks unattractive to men, was named as the sole beneficiary of her will, executed May 26, 1930, eleven days before her death.   The actual drafting and preparation was done by Altman's attorney, upon information given to him by Altman, yet said attorney never saw or talked to testatrix, nor did he preside over the execution of the will, nor become a subscribing witness and thus qualify to testify at the trial as to her directions, her wishes, her plans, or her physical and mental condition.

Altman first met the decedent in August, 1929, according to dependable witnesses, though one of proponent's witnesses testified he first met her in April, 1930.   He made love to her the second time he met her.   He called on her continuously.   She suffered serious losses in the October crash in Wall Street, and coincidentally her health began to fail.   She had had heart trouble for some years and with the failing health came dropsy.   In December she was very sick.   From that time on her illness became progressively worse and with her increasing sickness his influence with decedent grew stronger and stronger.   She gave him powers of attorney in her brokers' offices in that month.   In January she made a will revoking a former will executed in favor of all her relatives in 1927, and in the later will, after seven bequests to relatives, she made him, her " co-worker," as the will recited, her residuary legatee. She had a room at that time in Mrs. Post's apartment in West Eighty-eighth street, and there Altman came and spent practically every evening until late hours and all day on Sundays.   She was even at that early date sick unto death with her fatal malady. His visits persisted; he spent his hours with her; cooking was constantly going on.   Her friends criticized the situation into which testatrix had fallen.   Mrs. Post finally insisted on her leaving, and by wheel chair she was carried to her new abode in the Hotel Lucerne.   Here she lived until her death on June 6, 1930.   While she showed some improvement in March, it was only temporary. Meanwhile, Altman's attentions continued; without cessation his visits were made; he remained with her constantly night and day, and finally he moved there with his clothes and trunk and lived with

decedent in the double-room apartment until after her death. She had a day nurse during all her stay at this hotel, and from April fourteenth a night nurse also. Her condition grew worse. She ate little food. She saw few people. She was visited on a few occasions by relatives, who at various times also phoned about her condition. On three or four occasions she was visited by a doctor. A doctor had visited her previously at her room in Mrs. Post's, but Josephine L. Phelps, a Christian Science practitioner, ministered to her while she was in this hotel. Altman would leave the apartment at nine or ten in the morning and return at three or four in the afternoon. So far as the testimony goes, he had no business nor any visible means of support. He secured in April a power of attorney on her account with Woodworth, Lounsberry & Co., permitting him to draw money, the card being filled out with his handwriting. On May twenty-second the doctor saw her for the last time and stated that decedent might die at any time. On May twenty-first decedent signed a letter authorizing access to her safe deposit box in the National City Safe Deposit Company, which letter was entirely in Altman's handwriting. On May twenty-fourth he went to his attorney's office and had him draw up the paper now offered for probate, in which he, Altman, was named as sole beneficiary. The will was executed on May twenty-sixth. Altman's attorney was not present nor did he in any way participate in the execution of the paper. Besides testatrix and the three subscribing witnesses no one was present but Altman. The whole transaction took but ten minutes; few words were spoken, as will afterwards appear; the testatrix did not read the paper, nor was it read to her. It was, in the beginning of the brief ceremony, handed to her by Altman. Eleven days later she died. He employed the undertaker; and while some relatives were present at the funeral, no obituary notice was published. He took her pocketbook after death; he took the change which was in it. He continued to trade in her accounts in brokerage offices during June, July, August and September through the powers of attorney and never informed the brokers of her death until September twenty-fourth. In connection with several attempted transactions he intimated that he would not be able to secure her signature for thirty days, whereas she was dead for well over three months.

The trial was had before a jury and after the closing of the case six framed questions were submitted to it; the first three relating to the manner of execution, the fourth to the question of the testamentary capacity, and the fifth and sixth to the questions of undue influence and fraud respectively. The jury after deliberation returned a verdict answering " Yes " to the first four questions and

' No " to the last two; in other words, in favor of the proponent Altman on all the issues.

A careful analysis of the proofs submitted and a review of the whole case leads inevitably to the conclusion that the jury's verdict was against the weight of the evidence and contrary to law, at least so far as questions " fourth," " fifth " and " sixth " are concerned; and that deponent did not sustain the burden of proof imposed upon him with respect to the fourth issue, whereas the contestants met and sustained the burden cast upon them with reference to the fifth and sixth issues, viz., undue influence and fraud.

Before discussing these matters, there are several general comments which should be made: (1) The proponent produced but six witnesses: (a) the subscribing witnesses, Josephine L. Phelps, a Christian Science practitioner; Robert E. Sublett, the young elevator runner, and the colored nurse, Mabel Mitchell, and (b) H. W. Riendeau, the undertaker, whose testimony was confined to incidents following decedent's death; Dora Grace Ware, formerly a " materia medica " nurse, as she styled herself, and now a Christian Science practitioner, and Lucy Whitney Tice, who said she introduced decedent to proponent; (c) as witnesses both Miss Ware and Mrs. Tice were undependable. They appeared eager to testify; they were evasive and hesitant when pressed with questions on cross-examination, and there were contradictions in their testimony. Moreover, Mrs. Tice, who represented that she was an old friend of proponent, was unable to give much, if any, information about him. Again, her testimony related to a period *prior to the last four, if not five, months of decedent's life.* These two witnesses were not only undependable, but their testimony was unimpressive and of little value upon the issues in question. In addition, their memories were dim and vague on events or conversations which had occurred within fifteen months of this trial. (2) The contestants presented as witnesses: Gertrude Pfeifer, a law secretary in the office of the attorney who drafted decedent's will in 1927, giving all her property to relatives; Elsie R. Sergeant, a cousin of decedent, who described the latter's relatives; Minnie Post, who had known decedent for a long time, and in whose apartment decedent had a room for a year and a half prior to taking her room at the Lucerne; Fanny Mustin, a Christian Science practitioner, who knew decedent for some years; Marie Verlaguet, who roomed with Mrs. Post at the time when decedent roomed there; Jennie Carroll, a colored nurse who ministered to decedent from April 14, 1930, to her death, *almost* continuously; Frank Christopher, of the National City Safe Deposit Company; Messrs. Ledyard, Philips, Newman and Rosenthal, from brokerage offices, and H.

M. Hall, proponent's attorney. (3) Beginning with the testimony concerning the factum of the will a strong and substantial suspicion arose which went directly to the aim and purpose and plan of proponent. Admitted to the bar in another State, he was decedent's attorney. In another aspect too his relations were fiduciary, for he held her powers of attorney. Yet, in the matter of her last will, revoking previous wills in which her relatives were named, he has another attorney, who had not interviewed or advised with decedent, in fact had never seen decedent, draft the paper from information given him by proponent, said Altman, and proponent taking the completed paper presides over the execution of the will *in which he is named as sole beneficiary*. He knew, presumably, that his own lips would be sealed by section 347 of the Civil Practice Act, and that his attorney could be made eligible to testify and tell of interviews and conversations with decedent by being placed in charge of the whole matter and by acting as a subscribing witness.

We come now to the consideration of the issue of testamentary capacity and the proofs adduced by the proponent and the contestant upon said issue. The verdict of the jury was undeniably against the weight of the evidence, and the proponent failed to sustain the burden of proof imposed upon him. This conclusion of the court is borne out an l justified by the whole case. The following developments in the testimony, among many others, contributed to the above conviction: (1) As noted above, the only witnesses produced by the proponent to meet his burden with respect to testamentary capacity were the three subscribing witnesses, who testified that she was of sound mind; two other witnesses, Mrs. Ware and Mrs. Tice, whose testimony we have characterized above; and Riendeau, the undertaker, who only saw her dead. Surely it may not be argued that proponent established by a fair preponderance of evidence that decedent possessed testamentary capacity! Riendeau's testimony did not bear upon the issue at all. Mrs. Tice *last saw the decedent in January*. Even this witness testified in answer to the question: " Q. You knew she was in a terrible condition in January? " A. " I thought she was." Proponent's witness Ware confirms the testimony of all the witnesses of contestants as to decedent's physical condition. As to the condition in January she testified (p. 189): " I saw her much worse after. She was quite a sick woman and she was suffering with a malady which I understand thoroughly was a serious condition, not fully developed." She described her legs as " about as wide as my bag " and " her stomach as about half as large as it should be " and she said " water was running out of her legs." Of the three remaining witnesses, the subscribing witnesses, Sublett, the elevator runner,

is of doubtful help. He answered " Yes " to the stereotype question as to soundness of mind, but he had been in the room only ten minutes, and there was no act or action upon decedent's part and she spoke no words nor conversation except: " This is my will, will you please sign it? " In estimating the weight of the evidence offered by proponent on this issue, there remains to be considered only the testimony of Mabel Mitchell, the colored nurse, and Josephine L. Phelps, the Christian Science practitioner. While Mabel Mitchell testified that in her opinion decedent was of sound mind, she gave graphic description of her physical condition at various periods. On May twenty-second, the day Dr. Dixon called, she testified decedent was " terribly sick that day " and further that that was the reason the doctor was sent for. Josephine L. Phelps testified as to the execution of the paper and upon this subject her testimony coincides with that of Robert Sublett and Mabel Mitchell. The following excerpts of the testimony clearly indicate the doubts of the witness: " Q. And in your opinion was she of sound mind at the time of the execution of the will? Mr. Deremer: I object. (Objection overruled.) A. *Why she was very ill. I think that she knew what she was doing. Q. You think she was of sound mind?* Mr. Deremer: I object. (Objection overruled.) A. *I think she was. Q. And at the time of the execution of that will was Alice L. Rose under any restraint whatsoever?* Mr. Deremer: I object. (Objection overruled.) A. *I couldn't tell you that. Q. None that you saw? A. No, not in the sense of direct control. If you mean she was very fond of Mr. Altman, that I know.*"

She further testified (p. 91) that in January " a physician had been called to diagnose this condition. He had pronounced it as a very serious condition from which there was no hope of her recovering." Witness saw decedent nearly every day. Continuing she testified as follows: "Q. It was a typical sickroom? A. Yes, sir. Q. An odor from her illness? A. A very bad odor. Q. You saw Mr. Altman there frequently. A. Yes, sir. Q. What was he doing? A. Well he was attending to Miss Rose, and when I would go there I would be in the room alone with her. He was in the other room reading a paper or listening to the radio, smoking. * * * (p. 99): Q. Do you remember the 26th of May, 1930? A. I do. Q. Please state Miss Rose's physical condition on that day? A. She was very ill. Q. So ill it was expected she might die any day; is that right? A. Yes. (p. 100): Q. Do you remember the 22nd day of May, 1930, when Dr. Dixon came? A. I do. * * * Q. He was the doctor at that time? A. Yes, sir. Q. What did he say to you about her condition after he did examine her? A. He said it was a very serious condition, that it was an organic heart trouble

and dropsy and I asked him the question if he ever knew anyone to recover in a condition like that. He said he never did. * * * Q. Did you see Miss Rose on that day? A. I think I did. Q. What was her condition? A. Just about the same as it had been. Q. It was a case of waiting from day to day? A. Practically."

She testified further that decedent had been sitting in the chair upwards of six weeks, that she was unable to go to bed and unable to walk for six weeks. As of the time when decedent was living at Mrs. Post's witness testified: " She was very much bloated and unable to get out of her chair, I mean to walk about, although I was told she had been able to get back and forth to the bathroom then." (This was in January or earlier.) She further testified as follows: " Q. As a matter of fact you were told then that this man Altman led her to the bathroom in her bathrobe even then? A. I was told that by Mrs. Post. Q. You were surprised at the conditions that existed with this sick woman and this well man? A. I could not understand it."

After testifying that decedent had called her on the phone on May twenty-fifth and had asked her to come up in the morning and witness her signature, and that she, the witness, had phoned one of decedent's relatives to make sure it was all right for her to do so, the witness proceeded: " I shall say just this: I knew there was a great deal of uncertainty among the friends and relatives about this relationship, and these were friends of mine, Mrs. Sergeant, and I did not want to do anything that would be against the principles of all concerned. I wanted to be right and happy. Q. You at the same time felt there was a grave question about this woman's mental condition because of her physical condition; is that right? A. Wasn't the — well — I couldn't say it was her mental — Q. Yes or no? A. No, I wasn't uncertain about her mental condition. Q. But you knew her physical condition was such she was in a position where she might do something which was improper, didn't you, and that was the reason you called up? A. Presume so. Q. Then when you were asked the question a few minutes ago: At the time of the execution of the will was Alice Rose, the testatrix, under any restraint or subject to any influence whatsoever, you were only referring to the moment when she put her name on the instrument and not as to the surrounding circumstances and time; is that right? A. (No answer.) Q. In other words, when you answered that question in the affirmative — * * * I will repeat the question: At the time, therefore, that you answered this question in the affirmative you had in mind only the time when she signed her name; is that right? A. Yes. Q. *In other words, you meant that answer ' Yes ' to imply that at the time*

*she signed her name there was no one forcing her to sign it, is that what you meant?    A. I do."*

The remaining witness to be considered of those called by proponent is Mabel Mitchell, the colored nurse. She declared the decedent to be of sound mind; yet her description of the weakened condition of the decedent tallies with that given by all the witnesses Witness came there as nurse in March and after awhile decedent became so very seriously ill she needed another nurse. The other nurse came on April fourteenth. Witness described decedent's condition at the time she came as nurse. Her legs, she testified, were twice their regular size; " they were sore; " there was water running out of the sores; her abdomen was very hard; she could not get into bed; she never slept in bed in all the period while witness was there, except two or three nights; she gradually became worse.

The above summarizes the testimony on which proponent, a sole beneficiary, relies to meet the burden of proof imposed upon him. In weighing this testimony the facts must not be lost sight of (a) that there is a complete void in the record as to what her mental condition really was at the time she executed the paper, except the testimony of proponent's witnesses; (b) that two doctors had visited decedent, one who paid a single visit in January, and the second, who paid four visits later, the last only four days before the time of the execution of the paper, and they who might shed some light upon the question of decedent's mentality, and who should have been put upon the witness stand, were not called as witnesses; (c) that no letters, no missives, no documentary evidence were introduced to indicate her condition of mind when she signed a paper that in its provisions was entirely different from the disposition she declared in September, 1930, she would like to make of her property, and even substantially different from the will of January, 1930, which made Altman her residuary legatee after making seven bequests to relatives.

As against the record made by Altman affirmatively on the issue of testamentary capacity, we have the testimony of the witnesses called by contestant. The witness Mustin, who had known decedent for twenty years, testified (p. 261) that " She had had these attacks for five or six years off and on, and then in the fall of 1929 she came down with this very serious one; " that her condition became very serious around October first, that in November she was a very sick woman, her limbs were swollen, her legs were swollen, growing larger all the time; that in December she was very ill.

The witness Verlaguet testified (p. 27) that in December she kept growing worse and worse and was a very sick woman, and

"very little" able to be about in that month; that at the first of February her condition was "very, very bad."

Minnie Post testified (p. 255) as to her condition on the day, February first, when she left her apartment, stating that her condition was "just awful;" that she "expected her to die before she left the house;" that she was too big to put in a taxicab; that "she was entirely too ill for me to suggest anything out of her ordinary manner of living."

Jennie Carroll testified (p. 301) in reference to her condition during the last two weeks of her life, "She was very, very, ill, expected to die any moment;" that she was not able to lie down; that "from the time I went to her she did not even lie down from the time I went to her;" that she always sat in a chair; that he (Altman) "told me once shortly before she died to give her some pills to make her rest, and first she did not want to take them and finally she asked did Mr. Altman say she should? I said ' Yes,' so she took one * * * that was about three or four days before she died."

After mature deliberation I have found no escape from the conclusion that proponent failed to sustain the burden of proof imposed upon him and the verdict of the jury was against the weight of evidence upon the issue of testamentary capacity, as defined in the charge of the court.

Before taking up an analysis of the record for the purpose of disclosing the evidences of undue influence and fraud, it may be apt to set forth what under the authorities is a clear and helpful statement defining and explaining what the proofs of undue influence may be. The Court of Appeals held in *Rollwagen* v. *Rollwagen* (63 N. Y. 504–519) as follows: " It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue*, in the sense of the law, when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case. * * * But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it. In 1 Jarman on Wills, 36, it is said: ' That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.'

" The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

Approaching the record we find conceded practically all of the facts so that there may be little or no argument as to them. The question as to when proponent first met decedent, viz., in April, 1929, or in August, 1929, involves a comparison of the witnesses' testimony bearing upon the point. I believe the contestants' witnesses' testimony on this point to be the more dependable and have taken August, 1929, as the approximate time of their first meeting. She was a maiden lady of education, culture, refinement, of fifty-eight years of age, formerly a librarian with the National City Bank; he a rugged-looking man in the forties, who had been admitted to the bar of South Carolina. According to the testimony, she was not a woman of beauty; she was rather a woman who was unattractive to men. There can be no question raised that he exercised an influence over her. Her own quoted words show this, and her numerous acts hereinafter referred to prove it. He made love to her on the second occasion when they were together. The record shows that he played no small part in her stock investment business. She suffered heavy losses in the crash. Coincidently her health began to fail. With her health rapidly failing and bodily illness increasing from day to day, from October on, salient facts and episodes develop. On December 2, 1929, on a blank form filled out in the handwriting of Altman, decedent gave him a power of attorney to trade in her account with Prince & Whitely, " or any place to which the account may be removed."

On December sixteenth she gave him an authorization to trade in her account in Chisholm & Chapman, the brokers. He traded in this account during the month of December. On January sixteenth she executed a will in which, after making seven bequests to relatives, she left him all of her residuary estate. In the typewritten provision for disposal of the residuary estate she refers to him as " my friend and co-worker." This language is significant for the reasons: (1) That there is no proof in the record that they were coworkers; indeed there is no indication that he worked at any calling or avocation, and (2) Miss Verlaguet testified that decedent had said to her in the middle of January: " I have been very busy yesterday; we were drawing a will." It is fair to assume that proponent had participated in the drawing of that will. The

execution of this will, coming as it did a month after the securing of the authorization to trade in her brokerage accounts, and at a time when she was extremely ill, and involving not only a revocation of her previous will, in which she left all her property to relatives, but also a bequest and devise to her new found friend of all of her residuary estate, is vital in the proof of undue influence and fraud. Comparing the provisions of this will of 1927 with the intentions which decedent expressed to Miss Verlaguet in August or September concerning the making of a will, viz.: " ' My affairs are much better than they were at the time I made my will, * * * I feel I would like to change my will and make some changes, * * * I feel that I would like to make a few changes. * * * My affairs are very much better than they were and I would like * * * I feel I would like to have a trust fund.' We were friends. We used to talk an awful lot about our affairs. I never thought I would have to bring it out here. So she said: ' I feel, always have felt that what my father left me will go to my father's relatives, the relatives on my father's side, and what I got from my mother, I am going to give to the relatives on my mother's side, and what I have made myself I am going to use the best way I see fit. * * * I would like to have — leave a trust fund,' " we cannot escape the conclusion that a force was working upon decedent's mind during the months of October, November, December and January, and that force had brought about a radical change in the disposition of her property by will. On the day after the execution of the January will there was sent or delivered to her brokers the following letter:

" CHISHOLM AND CHAPMAN,                     " *Jan.* 17, 30.

" GENTLEMEN: Please deliver to Woodworth, Lounsberry & Co., 52 Broadway, New York City, the securities carried on my account on payment by them of my debit balance with interest to date.

" Yours very truly,
" ALICE L. ROSE,
" by G. D. ALTMAN.

The " Alice L. Rose by G. D. Altman " is in proponent's handwriting. Subsequently decedent signed an authorization for Altman to buy and sell, etc., in Woodworth, Lounsberry & Co. On Apri 8, 1930, a full power of authorization was given Altman to trade in her account in said brokerage concern. In the printed card of authorization the name " G. D. Altman " in the two places where it appears is in his handwriting. On May 21, 1930, a letter, all of which is in Altman's handwriting except the signature, was addressed to the National City Deposit Company, Forty-

second street and Madison avenue, New York city, attention of Mr. Koop, as follows:

" DEAR SIRS. Please admit the bearer, Mr. G. D. Altman, to my safe deposit box today and at any future time or times, without written notice or permit from me until October 1st 1930 —

" Yrs. very truly

" #14489                                                  ALICE L. ROSE."

Thus, with the progressive weakening of the physical system of this awfully sick woman, the control of proponent became stronger. It should be noted that about the time of the writing of this letter, decedent was so ill that Dr. Dixon was sent for and he declared that she could not recover, and that witnesses have testified that her death was expected at any moment. Proponent being there with her day and night, and living in the same room, was an eye witness of her approach toward the end, yet he wrote in the above authorization of decedent " *without written notice or permit from me until October 1, 1930.*" Then the proponent saw his lawyer and gave him instructions as to the drawing of her will. The lawyer drafted the will on May 24, 1930, and on May 26, 1930, it was executed by decedent, proponent being in charge of the formalities, and proponent became the sole beneficiary of her estate. After her death he took the money from her pocketbook. Notwithstanding her death he continued until well into September to trade in her two brokerage accounts, never intimating until September 24, 1930, that she was dead. The following letter is a sample of the representations which he made at the brokerage offices:

" *August* 26, 1930.

" Messrs. PRINCE & WHITELY,

" 25 Broad Street,

" New York City.

" GENTLEMEN.— In the future I desire to have your Mr. J. B. Newman handle my account and receive credit for same.

" Trusting this will meet with your approval, I remain,

" Yours very truly,

" ALICE L. ROSE

" G. D. ALTMAN

"*Atty.*"

From one of the accounts he drew out different amounts as follows:

| | |
|---|---:|
| June 7, 1930 | $650 00 |
| June 26, 1930 | 100 00 |
| July 11, 1930 | 100 00 |
| August 5, 1930 | 200 00 |
| August 18, 1930 | 64 58 |

All of the proof concerning his dealings in her stock brokerage accounts *after her death* through the powers of attorney were admitted in evidence (1) because he is *sole beneficiary* of the will, and (2) because it goes to the question of the good faith, the purpose and the plan proponent had begun to work out when in the prior December and later in April he had secured these powers of attorney, and (3) it shows the culmination of what was manifestly planned by proponent in the earlier months of their acquaintanceship. The narrative of the activities of proponent in the larger and in the business affairs of decedent clearly shows the unusual influence exercised by proponent. Throughout the record there are still further evidences of his power over decedent. For example, Josephine L. Phelps testified (p. 134): " If she — she talked about him quite a bit. He seemed to — she seemed, her whole life seemed to want to please him;" and a further example: " Q. Did you ever hear him make this statement to you: ' Now, I could make her do anything,' or ' I could almost make her change her religion? ' A. *I did.* Q. *When did you hear that?* A. *The night she died.*" (Mabel Mitchell, p. 70.)

The proofs submitted show that proponent had acquired a complete control over decedent, over herself, her affections, her attentions and her interest, and so strong a control that she permitted his visits at her room in Mrs. Post's apartment night after night, with the result that her friends criticized and commented upon her mode of living, and Mrs. Post protested and decedent finally moved to the Lucerne, where later proponent moved in and lived with her. He dominated her even in what she ate. He acquired almost a complete control over her affairs and her property through powers of attorney and access to her safe deposit box, while the two wills, viz., of January and of May, made under the circumstances disclosed, show a domination over the disposition of her property.

Contestants sustained the burden of proof imposed upon them as to fifth and sixth questions which relate to fraud and undue influence. The verdict of the jury upon the fifth and sixth questions presented was clearly against the weight of the evidence and contrary to law. The motion to set aside the verdict as to said fifth and sixth questions or issues is granted, with an exception to the proponent, and a new trial will be ordered and the case set down for trial at the January, 1931, term.

Proceed accordingly.