In the Matter of the Estate of PERCIVAL THOMAS, Deceased.

Surrogate's Court, New York County, May 29, 1931.

*Appleton, Rice & Perrin,* for temporary administrator and executors.

*Wiliams & Saxe,* for Charles A. Thomas.

*Finis E. Montgomery,* for Kathryn T. Hicks.

*David M. Neuberger,* for the petitioner.

O'BRIEN, S. This is a contested probate proceeding. It was tried without a jury. The decedent died on January 30, 1930, leaving him surviving as his next of kin two sons and two daughters, namely, George P. Thomas, Charles A. Thomas, Margaret McCormick and Kathryn T. Hicks.

A will dated July 31, 1929, and a codicil dated November 8, 1929, were offered for probate. The validity of these instruments is attacked by the two sons of the decedent and his daughter Margaret McCormick. They object to their probate on the grounds (1) that the instruments were invalidly executed; (2) that the decedent lacked testamentary capacity, and (3) that they were executed through the exercise of undue influence on the part of decedent's daughter Kathryn T. Hicks, and her husband, Charles M. Hicks.

The provisions of the will are in substance as follows:

By the 2d paragraph the decedent bequeathed to his daughter Kathryn T. Hicks all his jewelry, automobiles, clothing and personal effects of every nature and description.

By the 3d paragraph he created a trust fund of $120,000 for the life of his son Charles A. Thomas, with remainder upon his death to the children of Charles A. Thomas then surviving and to the surviving issue of any deceased child.

By paragraph 4 he authorized and directed his executors to permit his daughter Kathryn T. Hicks and her family to occupy the two suites of apartments in 110 Riverside drive, New York city, then occupied by him, until the expiration of the leases of such apartments, without payment by her of any rent.

By paragraph 5 he devised and bequeathed the remainder of his estate to his executors, in trust, to be divided into as many shares as he had children surviving (other than his son Charles M. Thomas and his issue), with the income of each share to be applied to the use of his children during their respective lives, and with power to each child to appoint by will the remainder of his or her share.

*By paragraph 6 he directed that his estate shall be bound by the provisions of an agreement entered into by him with his son-in-law, Charles M. Hicks, dated November 2, 1928, relating to the purchase and sale of securities upon joint account then conducted with the brokerage houses of Parrish & Co. and Campbell, Starring & Co.*

The remaining provisions of the will dealt with the powers and duties of his executors and trustees. He appointed his friend Edwin T. Rice and the Chemical Bank and Trust Company executors and trustees, without security.

By his codicil the decedent modified paragraph " second " of his will by directing that in no event should the bequest to his son Charles A. Thomas exceed one-fourth of his residuary estate, and that if the sum of $120,000 bequeathed in his will in trust for such son should exceed such one-fourth of his residuary estate, it should abate to such proportion.

Then by paragraph 2 of his codicil he provided as follows: " By the sixth article of my will I directed that my estate should be bound by the provisions of an agreement entered into by me with my son-in-law Charles M. Hicks, dated November 2, 1928, relating to the purchase and sale of securities upon joint account. Since the execution of my will the said joint account business has been transferred to the firms of Baker, Winans & Harden and Charles D. Barney & Co. I direct that my estate shall be bound by the provisions of *said agreement and that my son-in-law Charles M. Hicks shall be permitted to extend the period for the liquidation of said account, not exceeding one year beyond the time permitted in said agreement.*" (Italics mine.)

In all other respects he ratified, approved and confirmed the provisions of the will.

The trial of this contest was protracted. A mass of testimony and exhibits was offered.

After extended consideration I have reached the conclusion that

the instruments offered for probate as the last will and codicil of the testator should be denied probate. The proponents have failed to meet the burden imposed upon them, of establishing the testamentary capacity of the testator. On the other hand, the testimony is replete with acts and circumstances supporting the burden which the contestants have, I hold, successfully sustained of proving undue influence and fraud exercised upon the testator by Mr. and Mrs. Hicks.

It is unnecessary to relate the many and detailed items of evidence adduced at the trial. Suffice it to state, in substance, the picture conceived by me from the testimony of the various witnesses appearing at the trial and the documentary proofs submitted which induced me to make the determination above stated.

I. (1) *Dealing first with the question of testamentary capacity*, the testimony of the physicians and nurses who attended decedent show that decedent was an aged and feeble man suffering from many serious physical ailments and from mental infirmity and incapacity. (2) At the time of his death he was in his eighty-first year. His wife had died in 1920. After his wife's death his daughter Kathryn T. Hicks, her husband, Charles M. Hicks, with their son Mercer and a daughter came to live with the decedent in his ten-room apartment at No. 190 Riverside drive, New York city. (3) The decedent was for a great many years president of the American Dyewood Company and a member of its board of directors. *In January of 1928* he resigned as president of said company due to ill health and the following year he terminated his membership in the directorate. His activities in business practically ceased entirely in 1928. *About a year later the decedent leased a twenty-two-room apartment at the same address, 190 Riverside drive,* which was furnished at the expense of the decedent who *also bore the household expenses of which Hicks was to pay one-half*. The Hicks family continued to live with the decedent until he died. (4) *While in Atlantic City in 1922 or 1923*, the decedent was stricken with a serious ailment and an operation was performed upon him. It seemed at that time that prostate trouble was approaching. He began to have the care of doctors and nurses. He showed the marks of age and of time. He was a very sick man. In 1926 a Dr. Krugler was called to treat the decedent. He attended him continuously from then until the time of his death, except during a period in 1929 when the decedent and the Hicks family were spending the summer at Rye, N. Y. A number of physicians were at various times called in as consultants. When *first examined in 1926, the testator was suffering from chronic myocarditis and arterio sclerosis, and from chronic hypertrophy of the prostate gland.* According to

the testimony of Dr. Krugler, *from 1926 on the myocarditis and prostatitis increased. In May of 1929* Dr. Krugler attended the decedent on twenty-three separate occasions. In June of that year he attended him on four separate occasions. (5) About the middle of June Dr. Vosburgh was called to treat the decedent at Rye, N. Y. He found that he was suffering from retention of urine and an enlarged prostate; that he was also suffering from *arterio sclerosis, from asthmatic attacks* and from *edema of the lungs.* On cross-examination he testified that the decedent had *chronic myocarditis* and that *myocarditis* together with *prostatitis* made him a very sick man; that the decedent also had *nephritis;* that he found evidences of *uremic poisoning,* which at its height affects a man's mental capacity; that to his knowledge uremic poisoning occurred twice in the case of the decedent; that poison filtrated through the decedent's system by reason of his condition, and that the decedent's physical condition naturally affected his mentality at times; that at one of the times when he visited the decedent he was in a condition of collapse, lying in bed gasping for air; that his heart action was rapid and feeble; that morphine and nitro-glycerine were administered. This collapse occurred on or about the *27th day of July, 1929. On that day Dr. Vosburgh warned the decedent that his condition was grave.* He discussed decedent's condition with Dr. Kruger and advised an operation which was opposed by decedent and Dr. Kruger who was for waiting. He described his physical appearance on that day as follows: " His face was then slightly flushed on the cheek bones like a ripened fall apple. His temporal arteries were prominent and tortuous, his frame slightly emaciated." *Prior to July twenty-seventh,* to wit, on *July 18, 1929,* decedent collapsed because of back pressure on his kidneys, and remained in such condition *July eighteenth, nineteenth and twentieth.* He testified that the decedent was potentially a very sick man and that his lease of life was not very long at the time he saw him; that certain precautions would not preclude the possibility of a fatal termination at any moment; that most of his calls at the decedent's home were made at night and were for the purpose of catheterization. He believed that the family should be apprised of the decedent's condition and suggested that they get in touch with the family doctor for consultation. (6) From 1926 on the decedent was continually under the attention of trained nurses. Mary Alekel, a registered nurse, attended him for two and one-half years, from the latter part of 1926 to May of 1929. She testified that very few visitors were permitted to enter his room; that Mr. Hicks used to tell her not to let anybody in there because it affected the decedent; that decedent had frequent attacks of prostate trouble; that

she attended the decedent night and day; that he used to go down to his business once a week, sometimes two or three times a week; that he used to go to the officers' meetings; that she would often go to the office with him and wait down stairs; that he reacted to influence of others and Hicks had influence over him; that he was feeble and childish; that he had frequent nervous attacks; that enemas were administered to him almost every night. (7) During the months of July and August, 1929, he was attended by nurse Margaret Ferguson. On the day following his collapse, on July twenty-seventh or twenty-eighth, she brought him to New York. She testified that he was an old man who had to be catered to; that he was never mentally well during the time she was with him. (8) Sybil C. Eden, another nurse, testified that she attended upon the decedent for a period of two months prior to November 22, 1929; at that time his condition was progressively worse and day and night nurses were always at hand; that decedent did not eat with the family; that he could not feed himself; that he spilled a glass of water; that he had no sense of direction in drinking; that he took a glass of water to his ear instead of to his mouth; that medicines were administered by the mouth and some by hypodermic injections; that codein was not strong enough and that she had to inject morphine; that decedent was extremely restless unless he had a sedative, and that he had to have one every night; that he was bedridden; that he was like a child and she had to manage him like a child; that he did not talk much and if he did it was always about his condition; that she never saw any letters delivered to decedent; that he had a fixed catheter in him; that the fixed catheter required morphine as he would get into a state of hysteria, excitement and discomfort; that she would not go out at night because of his mental condition; that Dr. Krugler visited the decedent every day and sometimes twice a day. (9) Margaret A. Broderick was the last nurse in attendance upon the decedent. Her testimony, in my opinion, is very important. She was with him from October 24, 1929, to January 30, 1930, the date of his death. She stated that during that period Drs. Krugler, Allison, Keyes, Harlow Brooks and Samuel Lambert attended the decedent. Around election day in November, 1929, decedent was in a very weakened condition and she had to prop him up with pillows. He had been very sick during the night and could hardly hold the pen in his hand. Decedent and she were given about fifty certificates of stock to sign. It took decedent about an hour or two to sign them. He did not sign them all at once. He would sign some and rest a while, and then sign some more. They were turned over for him to sign and he signed them. He did not look at them.

She testified decedent did not get any newspapers to read; she used to read the newspapers to him sometimes but he was not always able to listen. From Christmas day on when he had a spell the decedent was in a very bad condition. He was delirious about the 5th, 6th and 7th of January, 1930.

II. It is appropriate at this point to discuss the time and manner of the preparation and execution of the will, and right here there must be borne in mind all that has been outlined above on the matter of testator's antecedents, his age, his surroundings, his physical condition and the omnipresence of Hicks. The execution of the paper took *place on July 31, 1929,* not in Rye where testator and Mr. and Mrs. Hicks were summering and where testator had been under the attention of Dr. Vosburgh, but in the New York apartment to which he had been brought by auto. On the day before, Mr. Rice, the legal draftsman, had been hurriedly summoned from his country home at Stockbridge, Mass. Mr. Rice had three clerks from his office come to the apartment to witness the execution. It is a significant fact that he did not make himself a subscribing witness and thus qualify himself to give important testimony as to the testator's conversation, actions and condition. Objection made to his testimony was sustained but later on contestants withdrew their objection and he testified with respect to the instructions given him as to revising a will previously made. Decedent told the witness that he had been successful in Wall street, having made upwards of $600,000 in 1928; he (decedent) estimated his wealth at about $2,000,000 and said that he " was borrowing about $2,000,000 to supply the cash and credit *and Hicks was able to obtain information he thought was valuable.*" He also showed the witness a contract which he had made with Hicks in November of the preceding year, under which he and Hicks were conducting joint transactions on the stock exchange. He instructed the witness to refer in the revised will to the contract with Hicks and *to have a clause included which should make it obligatory on the executors to consult with Hicks regarding the liquidation of the estate.* He also instructed the witness to include in the will a clause appointing the trust company named in the will and himself as executors. *During this conversation Mr. and Mrs. Hicks were present.* Upon the arrival of the three clerks, Charles Engle, Henry Elsessen and Donald H. Starks, from Mr. Rice's office, they were ushered into the decedent's office *by Hicks.* The decedent and Mr. Rice were there at the time. They were introduced to the decedent. The will was executed with the usual formalities, and was handed over to Mr. Engel, one of the witnesses, who took it back with him to the office of Mr. Rice. Mr. Engel testified

that he made no observation of the decedent as to whether he was suffering or was under any restraint. No proof was offered as to the source of the direction or message to Mr. Rice to come to New York for the making of the will. On November 8, 1929, the codicil to decedent's will, which has been offered for probate, was executed at the decedent's residence; this time, however, in the decedent's bedroom. Again three employees of Mr. Rice were summoned to the testator's bedside, Mr. Engel, Mr. Starks and one Joseph Cole. *Upon their arrival Hicks ushered them into decedent's room.* Engel testified that at this time decedent appeared to be a very sick man; that he was weak and did not speak; that he appeared to have been through a great deal of suffering. Starks testified that the decedent looked sick and as though he had undergone a period of illness; that his hand was not entirely steady and his speech was hesitant and that of a weak man. *He also testified that the decedent accepted the statement of Hicks that the copy of the codicil was made to conform to the original which was not read to him.* The decedent's conversation consisted of the words, in answer to questions asked him, " I do."

III. Before discussing the proofs submitted upon the issue of undue influence, it is helpful to have before us as a light to guide us through the long story of the relations between testator and his daughter and son-in-law, a clear concept of what undue influence and fraud consist. The definition in *Rollwagen* v. *Rollwagen* (63 N. Y. 504) is as adequate as any that has come under our notice. The court there said: " It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue,* in the sense of the law, when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case. * * * But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it. In 1 Jarman on Wills, 36, it is said: ' That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.'

" The undue influence is not often the subject of direct proof.

It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

It will be recalled that after the death of his wife in 1920, the Hicks family went to live with decedent. In 1928 decedent was eighty years old, retired from business, a sick and an old man. Hicks had no means of support so far as the proofs show while formally he was paying part of the household expenses. The money which he used to make such payments came out of the joint accounts guaranteed by decedent and for which *Hicks had supplied no money.* There is nothing in the proof to show that Hicks had any other source of available funds. How significant are the checks drawn by Hicks regularly for household expenses from the joint accounts! How significant the total amounts, large sums drawn out by Hicks from the joint accounts! How significant that Hicks *from such accounts should pay three old loans from testator to him — one of $1,000 made October 20, 1919, another of $1,000 made on April 21, 1920.* Gradually the sway of Hicks grew stronger and stronger. How complete it became is evidenced by the following: (1) An agreement dated November 2, 1928; (2) a power of attorney executed at Rye, N. Y., on July 20, 1929; (3) a power of attorney executed at the Chemical National Bank, Seventy-third street and Broadway, New York city, on July 25, 1929; (4) the will of July 31, 1929; (5) a power of attorney dated October 15, 1929; (6) the codicil to decedent's will, dated November 8, 1929; (7) an agreement dated December 4, 1929, and (8) the transfers of the joint accounts to the decedent's individual account on January 6 and 8, 1930.

(1) On November 2, 1928, there was executed an agreement between the decedent and Hicks for the purpose, as stated in said agreement, of defining the individual interests of the decedent and Hicks in various joint speculative accounts then being carried in their joint names with the brokerage houses of Parrish & Co. and Campbell, Starring & Co. *In consideration of the securing of information by the said Hicks,* the decedent guaranteed the said accounts. It was understood that all profits and losses in connection with these speculations were to be divided equally between the decedent and Hicks though Hicks possessed no capacity to pay losses. And further, it was agreed that the survivor should have sole authority to liquidate the aforesaid accounts and should have one year after the date of decease to accomplish said liquidation. No evidence tending to show any facts or circumstances

leading up to the execution of this agreement has been offered by the proponents. *Clearly, Hicks, by said guaranty, sought to obtain great advantage to himself, although the profits and losses under that agreement were to be borne equally between the two.*

(2) On July 20, 1929, while the decedent was in a serious condition of collapse at Rye, as testified to by the nurse and Dr. Vosburgh attending upon him, he executed a power of attorney to his daughter Kathryn T. Hicks. The testimony of Edward V. Siedle, *the notary public* who took the acknowledgment of the power of attorney, discloses that *he was sent for by Charles M. Hicks;* that he found the decedent in bed sitting up; that he found the deceased had been very sick; that a nurse was in attendance; that there was a change in his condition, and that he had rapidly aged; that he was very much thinner; that he had a high color and his face was flushed, but that he did not know whether it was from drugs or a healthy condition; *that the paper had been all filled out and he did not know who prepared it; that the deceased made no reference to it nor did he discuss it.*

(3) On July 25, 1929, the decedent, *accompanied by Mrs. Hicks,* called at the Chemical Bank and Trust Company, New York. Reginald H. Brayley, manager of the Seventy-third street branch of the Chemical Bank and Trust Company, testified that the decedent said he wanted to execute a power of attorney in favor of Mrs. Hicks. He took out one of the blank forms which decedent signed twice in his presence. He asked the decedent whether he wanted to execute a general power of attorney in favor of Mrs. Hicks and the decedent said " yes." *Nothing was said to him about the power of attorney executed on July 20, 1929, at Westchester, also in favor of Mrs. Hicks.* The decedent had an account at that branch of the bank, and from the testimony one would believe that the principal purpose of the decedent's visit to the bank on that day was to procure a power of attorney solely for the purpose of having Mrs. Hicks in a position to draw checks upon that bank. Certainly no other reason was made apparent for executing another general power of attorney in favor of Mrs. Hicks in view of the execution of the power of attorney at Rye just five days earlier. No proof was offered as to the reason for securing two powers of attorney.

(4) The execution of the will on July 31, 1929, took place within a few days after the decedent had had a serious collapse at Rye, and after Dr. Vosburgh had warned the decedent that his condition was grave and that his lease of life was not very long. Without the knowledge of the doctor, Mr. and Mrs. Hicks brought the decedent to New York on the twenty-ninth of July and immediately Mr. Rice,

his attorney, was summoned for the purpose of having a new will drawn, despite the fact that it is conceded that in 1923 the decedent executed a will in which he made equal distribution of his estate among all his children. What was the necessity and purpose of such hasty action if not that they desired to secure unhampered control of decedent's property through the medium of a new will recognizing and confirming the contract of November, 1928, and providing that Hicks must be consulted in the liquidation of the estate, and again, for the reduction of the share left to Charles P. Thomas.

(5) On October 15, 1929, another power of attorney was signed by decedent *giving Hicks the right to manage, handle and direct all accounts of the decedent with C. D. Barney & Co.* This power of attorney was in connection with the transfer of one of the decedent's personal accounts and two of the joint accounts from Parrish & Co. to C. D. Barney & Co. The testimony discloses that in connection with the execution of this power of attorney *Hicks procured the signature of the decedent's secretary,* Miss Ryan, as notary public, to be placed thereon without the presence or acknowledgment of the decedent, *upon the promise by Hicks that he would have the decedent telephone her and acknowledge the signature over the phone later.* No communication, however, was had between the decedent and his secretary with respect to such acknowledgment.

(6) On November 8, 1929, the codicil to the will was executed by the decedent. The circumstances of the execution have already been described above. *Decedent's condition was at that time precarious. The news of the Wall Street market crash was kept from him.* There is no testimony whatsoever as to the state of mind of decedent with respect to the rapidly falling market condition, nor with respect to the decreased value of his estate. But suddenly in the presence of Hicks the codicil was executed. There is no direct evidence that decedent knew that his accounts had suffered such serious losses as to necessitate the drawing of the codicil.

(7) On December 4, 1929, while the decedent was in the throes of his ailments, attended by doctors and nurses and subjected to the dulling effects of hypodermic injections of drugs, *what appears to be a most unconscionable agreement* was entered into between the decedent and Hicks, whereby the agreement of November 2, 1928, was rescinded and whereby the decedent assumed liability for all losses sustained upon the joint accounts with the brokerage firms of Baker, Winans & Harden and C. D. Barney & Co., and *released Charles M. Hicks from all liability in connection with each of these accounts,* in consideration of *Hicks' assigning all his right, title and interest in the stock and securities held upon each of such accounts,*

and all claims, rights and interest in and to pay *any profit* which may be realized at any time thereafter upon each of said accounts. What the circumstances were which led up to this agreement do not appear.

(8) The climax of all the activities and of all the maneuvers of Hicks in the joint accounts and stock transactions brought out to the clearest and fullest light the purpose and plan of Hicks which was forecasted in the events of 1928 and 1929, viz., the transfer on January 6 and 8, 1930, of deficits amounting to about a million dollars from the joint accounts to decedent's personal account. Not content with the guaranty of the joint accounts, not content with the unconscionable agreement of December 4, 1929, through the medium of a power of attorney Hicks secures this transfer twenty-three days before decedent's death.

As a sidelight to all of the above transactions, it may be well to consider some of the testimony of the various witnesses concerning the relations between Hicks and decedent and to the latter's condition from time to time.

Mary Alekel testified that during the time she was nurse, Hicks was sometimes there all day long. As far as she understood " Mr. Hicks was doing his business for Mr. Thomas; taking care of his affairs, and he was there most all the morning, and would go out himself in the afternoon but he was there most every day in the morning attending to his business." She further testified: " Q. Did Mr. Thomas ever say anything to you about Mr. Hicks working for him? A. Yes, sir. Q. What did he say? A. He was not there one morning to take the stock report over the telephone and Mr. Thomas got quite upset about it, and they had a few words about it. Q. What did Mr. Thomas say? A. Mr. Thomas said that he paid him a salary to look after his affairs, and why didn't he do it right and do as I want him, and that was just before I left in July, 1928, in Rye."

Miss Broderick, the nurse, testified that Hicks was always in the apartment; that he was in the decedent's room every day; that Hicks several times asked her to step out of the room while he was speaking to decedent; that Hicks had entire charge of the whole apartment; that Hicks came into the room around election day and requested her to sign some papers; that she signed some stock certificates; that Hicks asked her to sign her name as a witness; that Hicks brought in the stocks and told decedent that there were some papers that he wanted him to sign, but did not tell him what they were, but she knew they were stocks; that decedent's son Percival Thomas was in the front of the apartment at the time; that Hicks always kept him out when there was

anything to be done in the room; that Hicks brought in the stocks and decedent was not able to sign them; that Hicks put them on the bed upside down and told her to try to have them signed; that decedent signed them in sections, in parts; that Hicks came in several times to find out if they were signed; that they were not all signed and there was a comforter on the bed; that there were twin beds in the room, and Hicks put the certificates under the comforter and told her not to let decedent's son see them when he came in the room; that Hicks kept decedent's son Percival Thomas out in the living room and when Hicks went out he took the stock and put it under his coat, closed his coat, and went past decedent over to decedent's office in the same apartment. On the following day, November 8, 1929, Hicks told decedent that "some men were coming from Mr. Rice's office to sign some papers, for him to sign some papers. Hicks asked me to leave the room when the men came." Hicks told her to try and keep decedent in bed to conserve his strength and not to let him get up until just before the men came up. She further testified that decedent did not get any newspapers to read; that she used to read the newspapers to him sometimes but he was not always able to listen; that during the stock break he was not allowed by Mr. Hicks to see papers because Hicks did not want him to know the condition of the stock market. She testified "he never received any mail even from a little trained nurse that wrote him a letter thanking him for something. It was opened and given to him. He never received any mail." She testified further that the Hickses always tried to get Mr. Thomas, decedent's son, in wrong with his father, and tried to prevent him from coming into the room; that Hicks tried to keep Percival Thomas, Jr., and decedent's daughter Mrs. McCormick out of the room by telling them that the decedent was sleeping or something of that kind; that no one was ever allowed to come into the room; that she had to show the decedent the little mark for him to sign; that decedent told her later that he was all broken up because he had to sign the stock certificates; that on Christmas day there was a party with cocktails and champagne; that it continued all day; that during this time nobody came into the decedent's room; that she permitted Thomas, Jr., and Mrs. McCormick to see the decedent while the Hicks family was out, but when they were in, the children were not permitted to see the decedent.

Nurse Sybil C. Eden testified that Hicks came to the decedent's room every night, took full control of him in every way. "When any question came up I didn't, as a matter of fact listen carefully to what he spoke about. I tried to be unobtrusive when the

family were with him, but little things came up at various times about his business and he would ask various questions and the attitude of Mr. Hicks toward him was always reassuring, cheerful and of a jolly nature. We all of us treated him like that, to encourage him, and trying to make him as happy as we could. There was never anything in anybody else's attitude very serious towards Mr. Thomas. *I should say we treated him more or less like a child.*"

As the story of the relations between testator and Mr. and Mrs. Hicks was unfolded, the accumulation of indicia, of clear criteria pointing to the control over testator developed, here, with small and minor details and there, with large and more salient and startling facts, such as the first agreement covering joint trading accounts and testator's guaranty of them and the several powers of attorney. The existence of the control was certainly proven as were the facts that it was complete and unbroken during the later years of his life. The control was exercised not for the benefit of testator but for the aggrandizement always of the persons exercising it. These benefits constantly accruing to Hicks were evidenced by many transactions large and small — for instance by the large amount of money withdrawn by Hicks for himself out of the joint accounts. The study and analysis of the stock transactions carried on in the twenty-two-room apartment with a direct wire to the brokers' offices by Hicks upon the name and credit and guaranty of an aged, disease-racked and childish octogenarian is most interesting but space will not permit the details here. The will and the codicil were the counterparts of the agreements, the guaranty of the joint accounts, the powers of attorney and the exercise of the powers of attorney; and the final result, the grand climax of this carefully guarded control, viz., the transfer of the $975,000 deficits to the personal accounts of decedent about three weeks before his death. *During the period from January 25, 1928, until December 31, 1929, Hicks withdrew from the joint accounts, in cash, the sum of $98,950, despite the fact that the condition of the accounts showed deficits and losses. The manipulations of the stock brokerage accounts were entirely in the hands of Hicks and at his directions.* Hicks participated in every episode and every act of the decedent. *He had complete charge of the stock brokerage accounts.* So far as appears, there was little or no proof that the decedent knew anything of the progress of the joint accounts, or that anything was done by Hicks to apprise him of their exact condition. *In order that Hicks might more readily operate the accounts, a private telephone wire was installed in the apartment occupied by him with the decedent, with direct con-*

*nection with the brokers with whom Hicks traded. All orders to the brokers were consummated at the direction of Hicks. There does not appear to be any order given by the decedent himself upon any of the accounts except with respect to an order for 3,000 shares of General Motors in February, 1928. All the orders came from Hicks and all dealings with respect to these accounts were with Hicks. Hicks' son, Mercer Hicks, was employed by Campbell, Starring & Co., and Hicks' son-in-law, Floyd Keser, was employed with Parrish & Co.* Beginning with November 2, 1928, the agreements, guaranties, powers of attorney, bills of sale, the will and the codicil signed by the decedent, all were to the advantage and benefit of Hicks, as above noted. All these instruments are unexplained. There is nothing to explain the old man's subjection to Hicks. Other than Hicks and his wife none of the children were given an opportunity to be alone with him for any length of time. The opportunity for the exercise of undue influence, by reason of the isolation of the decedent, his illness, his infirmities, his dependence upon nurses and doctors because of his gradually growing weakness and senility, was ever present with Hicks and his wife. Hicks was omnipresent and his control complete.

In conclusion I hold that upon the issue of testamentary capacity proponents have not sustained the burden of proof resting upon them; on the other hand, I hold that contestants have sustained the burden of proof as to the issue of undue influence. The will is, therefore, denied probate. Proceed accordingly.