OPINION OF THE COURT
Albert J. Emanuelli, S.
MOTION TO FILE LATE OBJECTIONS TO PROBATE
Pursuant to an order to show cause dated February 6, 1996, Kevin Bacon (Kevin), son of the testatrix, has moved to: (a) vacate his default and allow him to file late objections to the probate; and (b) stay the entry of the decree admitting the will to probate. Both the proponent, daughter Patricia Hallstein (Patricia), and objectant, son Francis Bacon (Francis), have vigorously opposed the motion. Decedent was survived by two sons, Francis and Kevin, and her daughters, Patricia, Georgia and Kathleen. She had a penultimate will executed in 1980, which left the residuary estate equally to Kevin and another son, Arnold.
Kevin has simultaneously filed proposed objections to probate, alleging that the will was procured as a result of undue influence and that the testatrix lacked capacity to make a will.
SUMMARY OF THE FACTS
Upon the death of the decedent on September 16, 1992, her will, dated July 16, 1992, was offered for probate on November 5, 1992 and process issued to Kevin and the other interested parties. Kevin defaulted in answering the citation. He now asserts his failure to object to probate was due to acute clinical depression afflicting him for several years, the result being an incapacity to protect his legal interests during the critical stages of this probate proceeding.
He traces the history of his depression to the death of his brother Arnold Bacon (Arnold) on July 8, 1992, and the nearly simultaneous diagnosis of his mother, the testatrix, with a vir *860 ulent form of cancer. It is undisputed that the testatrix was, in her later years, cared for by her two sons, Arnold and Kevin, with Kevin paying the property taxes on Arnold’s house where the testatrix resided with Arnold. Also unrefuted is the fact that Kevin provided them with a car, which he insured, and occasional sums of money for their subsistence. From all appearances, the three of them comprised a closely knit unit.
Arnold died intestate, and as his only surviving parent, the testatrix inherited the home. At that time she had a will in force which would leave the majority of her estate to Kevin. (At present the primary asset of the testatrix’s estate continues to be the house.) Kevin alleges that the testatrix had always intended him to be her primary beneficiary, due to his love ánd affection for her and his caring for her for so many years.
It is further contended that his happiness was destroyed when, in rapid succession, he faced the two above-described tragedies. In the final stages of his mother’s last illness, and arguably no longer able to cope with his depression, Kevin was hospitalized from July 18, 1992 until September 3, 1992. A statement from Four Winds Hospital in Katonah, New York, confirms this. Since July 13, 1994 he has undergone treatment once or twice a week, continuous psychotherapy, and remains under a physician’s care. This is evidenced by a letter addressed to his attorney from a licensed clinical psychologist, who has treated him from July 1994 to the present. In several medical evaluations, the doctor has stated that Kevin, for a continuous period since his hospitalization, has been mentally incapable of protecting his legal rights and interests.
During Kevin’s initial hospitalization and subsequent treatment, care of the testatrix shifted to her two daughters: Patricia, and Georgia (Georgia) Bova. Testatrix was admitted to Cedar Manor Nursing Home on June 30, 1992 after a stay at Peekskill Community Hospital. (Extensive medical records have been submitted.) She was, throughout her time at the hospital, administered morphine and demerol. Several family members have alleged in a series of affidavits that, as a direct consequence of her ingesting these potent opiates, they witnessed the testatrix endure extended hallucinogenic episodes. They further attest that, during her stay at the hospital, she was constantly dazed, incoherent and often failed to recognize her own immediate family. It was, later, during the period that testatrix was in the nursing home and allegedly still under the influence of morphine, that she executed a new will. Attached is an affidavit from a medical expert who *861 opines from the facts that at the time deceased executed her will she would have impaired judgment because of the painkilling medication. However, her attending physician has stated that throughout this time, and particularly at the time the will was executed, the testatrix was "alert, oriented and competent”. No physician has yet been cross-examined, but their opinions are presently the only medical evidence before the court.
It is acknowledged that the proponent and primary beneficiary, Patricia, found and contacted the drafting attorney, Linda Carmody-Roberts. The attorney was warned that a contest might be forthcoming and, as a precaution, videotaped the execution of the will. While the attorney alleges the video would show the testatrix had capacity to make the new will, the court has not seen it, or been provided a copy.
As to the allegations of undue influence, it is alleged that a list was created at the hospital and nursing home of people who were not allowed access to her. Kevin was among those family members listed, and was no longer permitted to visit his mother. Both Patricia and Georgia, however, were allowed admittance. There are further allegations by the family, again strongly disputed, that the proponent was heard to make false and disparaging remarks concerning Kevin to the testatrix.
Under the proffered will, Kevin was disinherited, and his sisters, Patricia and Georgia, substituted as primary beneficiaries. When the will was offered for probate, citation issued to the distributees. Shortly thereafter objections were filed by Francis, represented by Attorney Ronald Markowitz (Markowitz). Years passed before Kevin sought legal representation, retaining John Voelp (Voelp) in late 1994. Voelp, realizing that Kevin had failed to timely interpose objections, attempted to cure this default by bootstrapping Kevin’s objections to those filed by Francis. In any event, after lengthy pretrial discovery by Francis, the matter was set for a trial by jury. Thereafter a written stipulation of settlement was entered into on November 29, 1995 between objectant and the estate. Kevin was not a party.
There is some confusion as to whether there was a stipulation between Attorneys Voelp and Markowitz. The correspondence from Markowitz was in veiled terms, agreeing to "cooperate with [Kevin] in the hopes that together we [could] accomplish a good result.” Whether the attorney was merely putting off the movant, with no intention of cooperating, has not been proved. However, the attorneys actively corresponded *862 for nearly a year concerning their mutual concerns and established a course of conduct which could be consistent with an agreement to unite their efforts upon which Voelp relied.
Voelp also attempted to file a notice of appearance but it was rejected by the court. He did not receive notice of the settlement between Francis and Patricia, which excluded Kevin. Upon examining the file and discovering the settlement, this motion ensued.
DISCUSSION
From the arguments presented by the parties, it appears that Kevin has been the subject of an unfortunate series of events. However, in order to prevail on this application, he must satisfy two requirements. First, he must show a reasonable excuse for the delay (Anolick v Travelers Ins. Co., 63 AD2d 665; Matter of Boyce, 158 AD2d 422). Second, he must make a prima facie showing of merit to his proposed objections that the proffered will was procured by undue influence and/or that the testatrix lacked testamentary capacity. (Supra.) Alternatively stated, he must submit facts sufficient to afford a substantial basis for the contest and a reasonable probability of success (Matter of Martin, 14 Misc 2d 266). The court has wide latitude in exercising its discretion in such matters, in order to arrive at an equitable disposition (see, Matter of Martorano, 87 AD2d 592; Matter of Michalski, 52 AD2d 663).
Initially, Kevin’s mental condition as well as whether there was an agreement to combine objections must be considered, to determine whether Kevin has demonstrated a reasonable excuse for the long delay. Kevin has submitted affidavits which, if unrefuted, support a finding of acute clinical depression. According to his doctor (q. v., Martin Ogulnick, Ph.D., reports of Nov. 7, 1994 and Mar. 4, 1996), this condition would render him incapable of attending to his legal affairs for a continuous period starting prior to his mother’s death. Such an illness and interlude, if unchallenged, constitutes a reasonable excuse for delay in filing objections (see, e.g., Matter of Arneson, 84 Misc 2d 128).
Further, after retaining counsel, it must be demonstrated that the delay in moving to vacate the default was reasonable. It appears that rather than make an immediate motion to vacate the default, Voelp attempted to amicably resolve this issue by combining Kevin’s objections with Francis’ timely objections. When it became clear that such a harmonious course had been unexpectedly rejected, Voelp proceeded with the pres *863 ent motion. Due to the continued correspondence between the two attorneys, admitted telephone contact between them prior to the stipulation and the prompt making of the motion upon discovering that Francis settled his claim without consulting or including Kevin, the court could conclude that the delay was not unreasonable.
After demonstrating that the delay was reasonable, Kevin must then make a prima facie showing that his objections have merit or a reasonable probability of success. (Anolick v Travelers Ins. Co., supra; Matter of Boyce, supra; Matter of Martin, supra.) As to the allegation that the testatrix lacked testamentary capacity, the court finds sufficient facts to support this objection. A finding that testatrix lacked testamentary capacity based solely on the fact that she was hospitalized and on medication will not be sustained (see, Matter of McClear, 214 App Div 683, affd 247 NY 544). However, the motion is replete with numerous sworn accounts by several family members that during the period when the will was drafted and executed, the testatrix was in a hallucinatory state, failed to recognize her family members and was constantly dazed and confused. Further, it is generally conceded that the specific drugs (morphine and demerol), if administered in heavy doses, can have a mind altering effect. The court thus finds for the purposes of this motion that a prima facie showing that the testatrix lacked testamentary capacity has been demonstrated.
Kevin’s second objection is undue influence. He must show: (1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind of the testatrix at the time of the execution of the will; and (3) the execution of a will that, but for undue influence, would not have been executed. The three essential elements are motive, opportunity and the exercise of the influence (Matter of Walther, 6 NY2d 49; Matter of Gearin, 132 AD2d 799). While Kevin has only produced circumstantial evidence concerning undue influence, this objection is often dependent on just such evidence (Rollwagen v Rollwagen, 63 NY 504).
Kevin has arguably shown: that his sisters were all but the exclusive caretakers of the testatrix; that the will was drastically altered to their benefit from the previous will; that the testatrix was heavily medicated and thus more susceptible to undue influence; that he was denied access to his mother; that the proffered will is not in accordance with the testatrix’s professed testamentary plan; and that the sisters may have influenced testatrix by making untrue and disparaging *864 remarks about Kevin to her. Thus, for the purposes of this motion, Kevin has made a prima facie showing that undue influence was used in procuring the proffered will.
Holding up the entry of a decree following a decision admitting the will to probate is not something the court does lightly. The proponent is entitled to the most favorable treatment of this application under the circumstances. Therefore, the matter will be set down for a hearing on the issue of reasonable delay. This aspect will include both Kevin’s mental and physical condition, his continued failure to proceed once he retained counsel and whether a guardian ad litem should have been appointed for him in the first instance.
Regardless of the ultimate outcome of the hearing, this case points up the need of a petitioner, in any proceeding, to be extremely diligent in determining whether an interested party is under any disability which might require the appointment of a guardian ad litem. If there is any doubt, the better procedure is to list the individual as a person who may be under a disability. The court could then appoint someone to investigate and report whether a guardian ad litem was necessary.
As this court stated in Matter of Carvel (Apr. 13, 1995): "The question which the court must adjudicate is not whether the respondent is incompetent [see, Mental Hygiene Law] * * * but whether she is a person under disability within the meaning of SCPA 103 (4) for whom a guardian ad litem must be appointed, (SCPA 403 (2)) * * * A person under disability may include an incapacitated person who is defined merely as '[a]ny person who for any cause is incapable adequately to protect his or her rights * * *’ (SCPA 103 (25)) * * * The prospect that the rulings and orders of the court may be void or voidable because of a jurisdictional defect occasioned by the failure to appoint a guardian ad litem is a risk that must be given serious consideration.”
To err on the side of caution is better than risking a possible jurisdictional defect.
The matter is restored to the calendar of July 31, 1996 for the purpose of scheduling a hearing.